# DAWSON CHEMICAL CO. ET AL. v. ROHM & HAAS CO.

No. 79–669.   Argued April 21, 1980—Decided June 27, 1980

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 223. STEVENS, J., filed a dissenting opinion, *post*, p. 240.

*Ned L. Conley* argued the cause and filed briefs for petitioners.

*Rudolf E. Hutz* argued the cause for respondent. With him on the brief were *Arthur G. Connolly, Januar D. Bove, Jr., James M. Mulligan, George W. F. Simmons, William E. Lambert III*, and *J. Fay Hall, Jr.*

*Eugene L. Bernard* argued the cause for the National Agricultural Chemicals Association as *amicus curiae* urging affirmance. With him on the brief were *Frank L. Neuhauser, William K. Wells, Jr.*, and *John D. Conner.*\*

*Solicitor General McCree, Assistant Attorney General Litvack, Deputy Solicitor General Wallace, Robert B. Nicholson, Robert V. Allen, Roger

■■■■■■■■■

Mr. Justice Blackmun delivered the opinion of the Court.

This case presents an important question of statutory interpretation arising under the patent laws. The issue before us is whether the owner of a patent on a chemical process is guilty of patent misuse, and therefore is barred from seeking relief against contributory infringement of its patent rights, if it exploits the patent only in conjunction with the sale of an unpatented article that constitutes a material part of the invention and is not suited for commercial use outside the scope of the patent claims. The answer will determine whether respondent, the owner of a process patent on a chemical herbicide, may maintain an action for contributory infringement against other manufacturers of the chemical used in the process. To resolve this issue, we must construe the various provisions of 35 U. S. C. § 271, which Congress enacted in 1952 to codify certain aspects of the doctrines of contributory infringement and patent misuse that previously had been developed by the judiciary.

## I

The doctrines of contributory infringement and patent misuse have long and interrelated histories. The idea that a patentee should be able to obtain relief against those whose

B. Andewelt, and Frederic Freilicher filed a brief for the United States as amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed by William J. Butler, Jr., and Frank M. Northam for the American Chemical Society: by John H. Pickering, Donald F. Turner, Robert A. Hammond III, and A. Stephen Hut, Jr., for the Chemical Manufacturers Association; by Paul B. Bell, C. Lee Cook, Jr., James H. Marsh, Jr., and Roger W. Parkhurst for the Licensing Executives Society (U. S. A.), Inc.; by Robert H. Morse and Thomas J. Houser for the National Association of Manufacturers; by Eric P. Schellin for the National Small Business Association; by Barry D. Rein, Stanley H. Lieberstein, and Kenneth E. Madsen for the New York Patent Law Association; by Philip Elman, Joel E. Hoffman, and William R. Weissman for the Pharmaceutical Manufacturers Association; and by Timothy L. Tilton and Howard W. Bremer for the Society of University Patent Administrators et al.

acts facilitate infringement by others has been part of our law since *Wallace* v. *Holmes,* 29 F. Cas. 74 (No. 17,100) (CC Conn. 1871). The idea that a patentee should be denied relief against infringers if he has attempted illegally to extend the scope of his patent monopoly is of somewhat more recent origin, but it goes back at least as far as *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502 (1917). The two concepts, contributory infringement and patent misuse, often are juxtaposed, because both concern the relationship between a patented invention and unpatented articles or elements that are needed for the invention to be practiced.

Both doctrines originally were developed by the courts. But in its 1952 codification of the patent laws Congress endeavored, at least in part, to substitute statutory precepts for the general judicial rules that had governed prior to that time. Its efforts find expression in 35 U. S. C. § 271:

> "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
>
> "(b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
>
> "(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having

done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

Of particular import to the present controversy are subsections (c) and (d). The former defines conduct that constitutes contributory infringement; the latter specifies conduct of the patentee that is *not* to be deemed misuse.

## A

The catalyst for this litigation is a chemical compound known to scientists as "3, 4-dichloropropionanilide" and referred to in the chemical industry as "propanil." In the late 1950's, it was discovered that this compound had properties that made it useful as a selective, "post-emergence" herbicide particularly well suited for the cultivation of rice. If applied in the proper quantities, propanil kills weeds normally found in rice crops without adversely affecting the crops themselves. It thus permits spraying of general areas where the crops are already growing, and eliminates the necessity for hand weeding or flooding of the rice fields. Propanil is one of several herbicides that are commercially available for use in rice cultivation.

Efforts to obtain patent rights to propanil or its use as a herbicide have been continuous since the herbicidal qualities of the chemical first came to light. The initial contender for a patent monopoly for this chemical compound was the Monsanto Company. In 1957, Monsanto filed the first of three successive applications for a patent on propanil itself. After lengthy proceedings in the United States Patent Office, a patent, No. 3,382,280, finally was issued in 1968. It was de-

clared invalid, however, when Monsanto sought to enforce it by suing Rohm and Haas Company (Rohm & Haas), a competing manufacturer, for direct infringement. *Monsanto Co. v. Rohm & Haas Co.*, 312 F. Supp. 778 (ED Pa. 1970), aff'd, 456 F. 2d 592 (CA3), cert. denied, 407 U. S. 934 (1972). The District Court held that propanil had been implicitly revealed in prior art dating as far back as 1902, even though its use as a herbicide had been discovered only recently. 312 F. Supp., at 787–790. Monsanto subsequently dedicated the patent to the public, and it is not a party to the present suit.

Invalidation of the Monsanto patent cleared the way for Rohm & Haas, respondent here, to obtain a patent on the method or process for applying propanil. This is the patent on which the present lawsuit is founded. Rohm & Haas' efforts to obtain a propanil patent began in 1958. These efforts finally bore fruit when, on June 11, 1974, the United States Patent Office issued Patent No. 3,816,092 (the Wilson patent) to Harold F. Wilson and Dougal H. McRay.[1] The patent contains several claims covering a method for applying propanil to inhibit the growth of undesirable plants in areas containing established crops.[2] Rohm & Haas has been the sole owner of the patent since its issuance.

---

[1] The patent was issued to Rohm & Haas as the result of an interference proceeding in the United States Patent Office between Rohm & Haas and Monsanto. In that proceeding the Patent Office decided that Wilson, and not the applicant for the Monsanto patent (Huffman), was actually the first to invent the process for using propanil as a herbicide.

[2] The Wilson patent contains several claims relevant to this proceeding. Of these the following are illustrative:

1. "A method for selectively inhibiting growth of undesirable plants in an area containing growing undesirable plants in an established crop, which comprises applying to said area 3, 4-dichloropropionanilide at a rate of application which inhibits growth of said undesirable plants and which does not adversely affect the growth of said established crop."

2. "The method according to claim 1 wherein the 3, 4-dichloropropionanilide is applied in a composition comprising 3, 4-dichloropropionanilide and an inert diluent therefor at a rate of between 0.5 and 6 pounds of

Petitioners, too, are chemical manufacturers. They have manufactured and sold propanil for application to rice crops since before Rohm & Haas received its patent. They market the chemical in containers on which are printed directions for application in accordance with the method claimed in the Wilson patent. Petitioners did not cease manufacture and sale of propanil after that patent issued, despite knowledge that farmers purchasing their products would infringe on the patented method by applying the propanil to their crops. Accordingly, Rohm & Haas filed this suit, in the United States District Court for the Southern District of Texas, seeking injunctive relief against petitioners on the ground that their manufacture and sale of propanil interfered with its patent rights.

The complaint alleged not only that petitioners contributed to infringement by farmers who purchased and used petitioners' propanil, but also that they actually induced such infringement by instructing farmers how to apply the herbicide. See 35 U. S. C. §§ 271 (b) and (c). Petitioners responded to the suit by requesting licenses to practice the patented method. When Rohm & Haas refused to grant such licenses, however, petitioners raised a defense of patent misuse and counterclaimed for alleged antitrust violations by respondent. The parties entered into a stipulation of facts, and petitioners moved for partial summary judgment. They argued that Rohm & Haas has misused its patent by conveying the right to practice the patented method only to purchasers of its own propanil.

The District Court granted summary judgment for petitioners. 191 USPQ 691 (1976). It agreed that Rohm & Haas was barred from obtaining relief against infringers of its patent because it had attempted illegally to extend its patent monopoly. The District Court recognized that 35 U. S. C.

---

3, 4-dichloropropionanilide per acre." 191 USPQ 691, 695 (SD Tex. 1976).

§ 271 (d) specifies certain conduct which is not to be deemed patent misuse. The court ruled, however, that "[t]he language of § 271 (d) simply does not encompass the totality of [Rohm & Haas'] conduct in this case." 191 USPQ, at 704. It held that respondent's refusal to grant licenses, other than the "implied" licenses conferred by operation of law upon purchasers of its propanil, constituted an attempt by means of a "tying" arrangement to effect a monopoly over an unpatented component of the process. The District Court concluded that this conduct would be deemed patent misuse under the judicial decisions that preceded § 271 (d), and it held that "[n]either the legislative history nor the language of § 271 indicates that this rule has been modified." 191 USPQ, at 707.[3]

The United States Court of Appeals for the Fifth Circuit reversed. 599 F. 2d 685 (1979). It emphasized the fact that propanil, in the terminology of the patent law, is a "nonstaple" article, that is, one that has no commercial use except in connection with respondent's patented invention. After a thorough review of the judicial developments preceding enactment of § 271, and a detailed examination of the legislative history of that provision, the court concluded that the legislation restored to the patentee protection against contributory infringement that decisions of this Court theretofore had undermined. To secure that result, Congress found it necessary to cut back on the doctrine of patent misuse. The Court of Appeals determined that, by specifying in § 271 (d) conduct that is not to be deemed misuse, "Congress

---

[3] The District Court limited its ruling on the motion for partial summary judgment to the question of patent misuse. It admonished that "[n]othing in this ruling should be construed to be determinative" of petitioners' antitrust counterclaims. 191 USPQ, at 707. These counterclaims are based, *inter alia*, on allegations that Rohm & Haas engaged in coercive marketing practices prior to issuance of the Wilson patent. These charges are not implicated in this appeal, and they remain for development on remand.

*did* clearly provide for a patentee's right to exclude others and reserve to itself, if it chooses, the right to sell nonstaples used substantially only in its invention." 599 F. 2d, at 704 (emphasis in original). Since Rohm & Haas' conduct was designed to accomplish only what the statute contemplated, the court ruled that petitioners' misuse defense was of no avail.

We granted certiorari, 444 U. S. 1012 (1980), to forestall a possible conflict in the lower courts[4] and to resolve an issue of prime importance in the administration of the patent law.

## B

For present purposes certain material facts are not in dispute. First, the validity of the Wilson patent is not in question at this stage in the litigation.[5] We therefore must assume that respondent is the lawful owner of the sole and exclusive right to use, or to license others to use, propanil as a herbicide on rice fields in accordance with the methods claimed in the Wilson patent. Second, petitioners do not dispute that their manufacture and sale of propanil together with instructions for use as a herbicide constitute contributory infringement of the Rohm & Haas patent. Tr. of Oral Arg. 14. Accordingly, they admit that propanil constitutes "a material part of [respondent's] invention," that it is "espe-

---

[4] There is no direct conflict, but a number of decisions exhibit some tension on questions of patent misuse and the scope of 35 U. S. C. § 271 (d). Cf., *e. g.*, *Ansul Co.* v. *Uniroyal, Inc.*, 306 F. Supp. 541, 562 (SDNY 1969), aff'd in part and rev'd in part, 448 F. 2d 872 (CA2 1971), cert. denied *sub nom. Uniroyal, Inc.* v. *Louisville Chemical Co.*, 404 U. S. 1018 (1972); *Rohm & Haas Co.* v. *Roberts Chemicals, Inc.*, 245 F. 2d 693, 699 (CA4 1957); *Harte & Co.* v. *L. E. Carpenter & Co.*, 138 USPQ 578, 584 (SDNY 1963); *Sola Electric Co.* v. *General Electric Co.*, 146 F. Supp. 625, 647–648 (ND Ill. 1956). See also Nelson, Mercoid-Type Misuse is Alive, 56 J. Pat. Off. Soc. 134 (1974).

[5] In their answers to the complaint, petitioners asserted the invalidity of Rohm & Haas' patent on a variety of grounds. See 599 F. 2d 685, 687 (1979). These contentions have not yet been addressed or decided by either the District Court or the Court of Appeals.

cially made or especially adapted for use in an infringement of [the] patent," and that it is "not a staple article or commodity of commerce suitable for substantial noninfringing use," all within the language of 35 U. S. C. § 271 (c).[6] They also concede that they have produced and sold propanil with knowledge that it would be used in a manner infringing on respondent's patent rights. To put the same matter in slightly different terms, as the litigation now stands, petitioners admit commission of a tort and raise as their only defense to liability the contention that respondent, by engaging in patent misuse, comes into court with unclean hands.[7]

As a result of these concessions, our chief focus of inquiry must be the scope of the doctrine of patent misuse in light of the limitations placed upon that doctrine by § 271 (d). On this subject, as well, our task is guided by certain stipulations and concessions. The parties agree that Rohm & Haas makes and sells propanil; that it has refused to license petitioners or any others to do the same; that it has not granted express licenses either to retailers or to end users of the product; and that farmers who buy propanil from Rohm & Haas may use it, without fear of being sued for direct infringement, by virtue of an "implied license" they obtain when Rohm & Haas relinquishes its monopoly by selling the propanil. See App. 35–39. See also *United States* v. *Univis Lens Co.,* 316 U. S. 241, 249 (1942); cf. *Adams* v. *Burke,* 17 Wall. 453 (1873). The parties further agree that §§ 271 (d)(1) and (3) permit respondent both to sell propanil itself and to sue

---

[6] We follow the practice of the Court of Appeals and the parties by using the term "nonstaple" throughout this opinion to refer to a component as defined in 35 U. S. C. § 271 (c), the unlicensed sale of which would constitute contributory infringement. A "staple" component is one that does not fit this definition. We recognize that the terms "staple" and "nonstaple" have not always been defined precisely in this fashion.

[7] See *Thomson-Houston Electric Co.* v. *Ohio Brass Co.,* 80 F. 712, 721 (CA6 1897) (contributory infringement a tort); *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488, 492–494 (1942) (patent misuse linked to equitable doctrine of "unclean hands").

others who sell the same product without a license, and that under § 271 (d)(2) it would be free to demand royalties from others for the sale of propanil if it chose to do so.

The parties disagree over whether respondent has engaged in any additional conduct that amounts to patent misuse. Petitioners assert that there has been misuse because respondent has "tied" the sale of patent rights to the purchase of propanil, an unpatented and indeed unpatentable article, and because it has refused to grant licenses to other producers of the chemical compound. They argue that § 271 (d) does not permit any sort of tying arrangement, and that resort to such a practice excludes respondent from the category of patentees "otherwise entitled to relief" within the meaning of § 271 (d). Rohm & Haas, understandably, vigorously resists this characterization of its conduct. It argues that its acts have been only those that § 271 (d), by express mandate, excepts from characterization as patent misuse. It further asserts that if this conduct results in an extension of the patent right to a control over an unpatented commodity, in this instance the extension has been given express statutory sanction.

## II

Our mode of analysis follows closely the trail blazed by the District Court and the Court of Appeals. It is axiomatic, of course, that statutory construction must begin with the language of the statute itself. But the language of § 271 is generic and freighted with a meaning derived from the decisional history that preceded it. The Court of Appeals appropriately observed that more than one interpretation of the statutory language has a surface plausibility. To place § 271 in proper perspective, therefore, we believe that it is helpful first to review in detail the doctrines of contributory infringement and patent misuse as they had developed prior to Congress' attempt to codify the governing principles.

As we have noted, the doctrine of contributory infringe-

ment had its genesis in an era of simpler and less subtle technology. Its basic elements are perhaps best explained with a classic example drawn from that era. In *Wallace* v. *Holmes*, 29 F. Cas. 74 (No. 17,100) (CC Conn. 1871), the patentee had invented a new burner for an oil lamp. In compliance with the technical rules of patent claiming, this invention was patented in a combination that also included the standard fuel reservoir, wick tube, and chimney necessary for a properly functioning lamp. After the patent issued, a competitor began to market a rival product including the novel burner but not the chimney. *Id.,* at 79. Under the sometimes scholastic law of patents, this conduct did not amount to direct infringement, because the competitor had not replicated every single element of the patentee's claimed combination. Cf., *e. g., Prouty* v. *Ruggles,* 16 Pet. 336, 341 (1842). Yet the court held that there had been "palpable interference" with the patentee's legal rights, because purchasers would be certain to complete the combination, and hence the infringement, by adding the glass chimney. 29 F. Cas., at 80. The court permitted the patentee to enforce his rights against the competitor who brought about the infringement, rather than requiring the patentee to undertake the almost insuperable task of finding and suing all the innocent purchasers who technically were responsible for completing the infringement. *Ibid.* See also *Bowker* v. *Dows,* 3 F. Cas. 1070 (No. 1,734) (CC Mass. 1878).

The *Wallace* case demonstrates, in a readily comprehensible setting, the reason for the contributory infringement doctrine. It exists to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others. This protection is of particular importance in situations, like the oil lamp case itself, where enforcement against direct infringers would be difficult, and where the technicalities of patent law make it relatively easy to profit from another's invention without risking a charge of direct infringement.

See *Thomson-Houston Electric Co.* v. *Ohio Brass Co.*, 80 F. 712, 721 (CA6 1897) (Taft, Circuit Judge); Miller, Some Views on the Law of Patent Infringement by Inducement, 53 J. Pat. Off. Soc. 86, 87–94 (1971).

Although the propriety of the decision in *Wallace* v. *Holmes* seldom has been challenged, the contributory infringement doctrine it spawned has not always enjoyed full adherence in other contexts. The difficulty that the doctrine has encountered stems not so much from rejection of its core concept as from a desire to delimit its outer contours. In time, concern for potential anticompetitive tendencies inherent in actions for contributory infringement led to retrenchment on the doctrine. The judicial history of contributory infringement thus may be said to be marked by a period of ascendancy, in which the doctrine was expanded to the point where it became subject to abuse, followed by a somewhat longer period of decline, in which the concept of patent misuse was developed as an increasingly stringent antidote to the perceived excesses of the earlier period.

The doctrine of contributory infringement was first addressed by this Court in *Morgan Envelope Co.* v. *Albany Paper Co.*, 152 U. S. 425 (1894). That case was a suit by a manufacturer of a patented device for dispensing toilet paper against a supplier of paper rolls that fit the patented invention. The Court accepted the contributory infringement doctrine in theory but held that it could not be invoked against a supplier of perishable commodities used in a patented invention. The Court observed that a contrary outcome would give the patentee "the benefit of a patent" on ordinary articles of commerce, a result that it determined to be unjustified on the facts of that case. *Id.*, at 433.

Despite this wary reception, contributory infringement actions continued to flourish in the lower courts.[8] Eventually

---

[8] See, *e. g.*, *Thomson-Houston Electric Co.* v. *Kelsey Electric R. Specialty Co.*, 72 F. 1016 (CC Conn. 1896); *American Graphophone Co.* v.

the doctrine gained more wholehearted acceptance here. In *Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 325 (1909), the Court upheld an injunction against contributory infringement by a manufacturer of phonograph discs specially designed for use in a patented disc-and-stylus combination. Although the disc itself was not patented, the Court noted that it was essential to the functioning of the patented combination, and that its method of interaction with the stylus was what "mark[ed] the advance upon the prior art." *Id.,* at 330. It also stressed that the disc was capable of use only in the patented combination, there being no other commercially available stylus with which it would operate. The Court distinguished the result in *Morgan Envelope* on the broad grounds that "[n]ot one of the determining factors there stated exists in the case at bar," and it held that the attempt to link the two cases "is not only to confound essential distinctions made by the patent laws, but essential distinctions between entirely different things." 213 U. S., at 335.

The contributory infringement doctrine achieved its highwater mark with the decision in *Henry* v. *A. B. Dick Co.,* 224 U. S. 1 (1912). In that case a divided Court extended contributory infringement principles to permit a conditional licensing arrangement whereby a manufacturer of a patented printing machine could require purchasers to obtain all supplies used in connection with the invention, including such staple items as paper and ink, exclusively from the patentee. The Court reasoned that the market for these supplies was created by the invention, and that sale of a license to use the

*Amet,* 74 F. 789 (CC ND Ill. 1896); *Thomson-Houston Electric Co.* v. *Ohio Brass Co., supra; Red Jacket Mfg. Co.* v. *Davis,* 82 F. 432, 439 (CA7 1897); *American Graphophone Co.* v. *Leeds,* 87 F. 873 (CC SDNY 1898); *Wilkins Shoe-Button Fastener Co.* v. *Webb,* 89 F. 982, 996 (CC ND Ohio 1898); *Canda* v. *Michigan Malleable Iron Co.,* 124 F. 486, 489 (CA6 1903); *James Heekin Co.* v. *Baker,* 138 F. 63, 66 (CA8 1905) (Van Devanter, Circuit Judge).

patented product, like sale of other species of property, could be limited by whatever conditions the property owner wished to impose. *Id.*, at 31–32. The *A. B. Dick* decision and its progeny in the lower courts led to a vast expansion in conditional licensing of patented goods and processes used to control markets for staple and nonstaple goods alike.[9]

This was followed by what may be characterized through the lens of hindsight as an inevitable judicial reaction. In *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502 (1917), the Court signalled a new trend that was to continue for years thereafter.[10] The owner of a patent on projection equipment attempted to prevent competitors from selling film for use in the patented equipment by attaching to the projectors it sold a notice purporting to condition use of the machine on exclusive use of its film. The film previously had been patented but that patent had expired. The Court addressed the broad issue whether a patentee possessed the right to condition sale of a patented machine on the purchase of articles "which are no part of the patented machine, and which are not patented." *Id.*, at 508. Relying upon the rule that the scope of a patent "must be limited to the invention described in the claims," *id.*, at 511, the Court held that the attempted restriction on use of unpatented supplies was improper:

> "Such a restriction is invalid because such a film is obviously not any part of the invention of the patent in suit; because it is an attempt, without statutory warrant, to continue the patent monopoly in this particular char-

---

[9] See F. Vaughan, Economics of Our Patent System 253–254 (1925) (collecting cases).

[10] In addition to this judicial reaction, there was legislative reaction as well. In 1914, partly in response to the decision in *Henry* v. *A. B. Dick Co.*, 224 U. S. 1 (1912), Congress enacted § 3 of the Clayton Act, 38 Stat 731, 15 U. S. C. § 14. See *International Business Machines Corp.* v *United States*, 298 U. S. 131, 137–138 (1936).

acter of film after it has expired, and because to enforce it would be to create a monopoly in the manufacture and use of moving picture films, wholly outside of the patent in suit and of the patent law as we have interpreted it." *Id.*, at 518.

By this reasoning, the Court focused on the conduct of the patentee, not that of the alleged infringer. It noted that as a result of lower court decisions, conditional licensing arrangements had greatly increased, indeed, to the point where they threatened to become "perfect instrument[s] of favoritism and oppression." *Id.*, at 515. The Court warned that approval of the licensing scheme under consideration would enable the patentee to "ruin anyone unfortunate enough to be dependent upon its confessedly important improvements for the doing of business." *Ibid.* This ruling was directly in conflict with *Henry* v. *A. B. Dick Co., supra,* and the Court expressly observed that that decision "must be regarded as overruled." 243 U. S., at 518.

The broad ramifications of the *Motion Picture* case apparently were not immediately comprehended, and in a series of decisions over the next three decades litigants tested its limits. In *Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27 (1931), the Court denied relief to a patentee who, through its sole licensee, authorized use of a patented design for a refrigeration package only to purchasers from the licensee of solid carbon dioxide ("dry ice"), a refrigerant that the licensee manufactured.[11] The refrigerant was a well-known and widely used staple article of commerce, and the patent in question claimed neither a machine for making it nor a process for using it. *Id.*, at 29. The Court held that the patent holder and its licensee were attempting to exclude

---

[11] In a subsequent decision rendered during the same Term, the Court held that the patent itself was invalid because the claimed package had been anticipated by prior art. *Carbice Corp.* v. *American Patents Co.*, 283 U. S. 420 (1931).

competitors in the refrigerant business from a portion of the market, and that this conduct constituted patent misuse. It reasoned:

> "Control over the supply of such unpatented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used. Relief is denied because the '[licensee] is attempting, without sanction of law, to employ the patent to secure a limited monopoly of unpatented material used in applying the invention." *Id.*, at 33–34.

The Court also rejected the patentee's reliance on the *Leeds & Catlin* decision. It found "no suggestion" in that case that the owner of the disc-stylus combination patent had attempted to derive profits from the sale of unpatented supplies as opposed to a patented invention. 283 U. S., at 34.

Other decisions of a similar import followed. *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458 (1938), found patent misuse in an attempt to exploit a process patent for the curing of cement through the sale of bituminous emulsion, an unpatented staple article of commerce used in the process. The Court eschewed an attempt to limit the rule of *Carbice* and *Motion Picture* to cases involving explicit agreements extending the patent monopoly, and it stated the broad proposition that "every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited." 302 U. S., at 463. *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488, 492–494 (1942), which involved an attempt to control the market for salt tablets used in a patented dispenser, explicitly linked the doctrine of patent misuse to the "unclean hands" doctrine traditionally applied by courts of equity. Its companion case, *B. B. Chemical Co.* v. *Ellis*, 314 U. S. 495, 495–498 (1942), held that patent misuse barred relief even where infringement had been actively induced, and that practical

difficulties in marketing a patented invention could not justify patent misuse.[12]

Although none of these decisions purported to cut back on the doctrine of contributory infringement itself, they were generally perceived as having that effect, and how far the developing doctrine of patent misuse might extend was a topic of some speculation among members of the patent bar.

---

[12] This case arguably involved an application of the misuse doctrine to an attempt to control a nonstaple material. It arose from a suit for infringement of a process patent claiming a method for reinforcing insoles used in shoes. The patentee marketed its patented process in connection with sale of canvas duck that had been precoated with adhesive for use in the patented process. It claimed that suppliers of a rival adhesive-coated duck fabric, suitable for use in the patented method, had both contributed to and induced infringement of the patent. The Court of Appeals found patent misuse. It rejected, *inter alia*, the patentee's contention that *Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27 (1931), and *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458 (1938), were inapplicable because the adhesive-coated duck was a nonstaple article. *B. B. Chemical Co.* v. *Ellis*, 117 F. 2d 829, 834–835 (CA1 1941). The question whether the allegedly nonstaple nature of the item affected the applicability of the *Carbice* and *Leitch* standards was presented to this Court on certiorari. See Pet. for Cert. in *B. B. Chemical Co.* v. *Ellis*, O. T. 1941, No. 75, p. 10. In the petitioner's brief on the merits, however, the nonstaple character of the item was not pressed as a ground for legal distinction, and respondents argued that the material was not a nonstaple. See Brief for Petitioner, O. T. 1941, No. 75, p. 20; Brief for Respondents, O. T. 1941, No. 75, pp. 11–13. The Court did not mention this question in its brief opinion. In contrast to the dissent, *post*, at 227–229, we decline in the absence of any articulated reasoning to speculate whether the Court accepted the respondents' view that only a staple commodity was involved, adopted some other position, or, as the failure to discuss *Leeds & Catlin Co.* v. *Victor Talking Machine Co.*, 213 U. S. 325 (1909), might suggest, simply chose not to address a matter that had not been fully presented. We also disagree with the dissent's attempt, *post*, at 229, n. 3, to equate the unconditional licenses belatedly proposed by the patentee in *B. B. Chemical* with the licensing scheme practiced in *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661 (1944), and *Mercoid Corp.* v. *Minneapolis-Honeywell Regulator Co.*, 320 U. S. 680 (1944). See *infra*, at 195–197.

The Court's decisions had not yet addressed the status of contributory infringement or patent misuse with respect to nonstaple goods, and some courts and commentators apparently took the view that control of nonstaple items capable only of infringing use might not bar patent protection against contributory infringement.[13]  This view soon received a serious, if not fatal, blow from the Court's controversial decisions in *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661 (1944) (*Mercoid I*), and *Mercoid Corp.* v. *Minneapolis-Honeywell Regulator Co.*, 320 U. S. 680 (1944) (*Mercoid II*). In these cases, the Court definitely held that any attempt to control the market for unpatented goods would constitute patent misuse, even if those goods had no use outside a patented invention.  Because these cases served as the point of departure for congressional legislation, they merit more than passing citation.

Both cases involved a single patent that claimed a combination of elements for a furnace heating system.  Mid-Continent was the owner of the patent, and Honeywell was its licensee.  Although neither company made or installed the furnace system, Honeywell manufactured and sold stoker switches especially made for and essential to the system's operation.  The right to build and use the system was granted to purchasers of the stoker switches, and royalties owed the patentee were calculated on the number of stoker switches sold.  Mercoid manufactured and marketed a competing stoker switch that was designed to be used only in the patented combination.  Mercoid had been offered a sublicense

---

[13] See, *e. g., J. C. Ferguson Mfg. Works* v. *American Lecithin Co.*, 94 F. 2d 729, 731 (CA1), cert. denied, 304 U. S. 573 (1938); *Johnson Co.* v. *Philad Co.*, 96 F. 2d 442, 446–447 (CA9 1938); but see *Philad Co.* v. *Lechler Laboratories, Inc.*, 107 F. 2d 747, 748 (CA2 1939).  See also Diamond, The Status of Combination Patents Owned by Sellers of an Element of the Combination, 21 J. Pat. Off. Soc. 843, 849–850 (1939); Thomas, The Law of Contributory Infringement, 21 J. Pat. Off. Soc. 811, 835, 842 (1939).

by the licensee but had refused to take one. It was sued for contributory infringement by both the patentee and the licensee, and it raised patent misuse as a defense.

In *Mercoid I* the Court barred the patentee from obtaining relief because it deemed the licensing arrangement with Honeywell to be an unlawful attempt to extend the patent monopoly. The opinion for the Court painted with a very broad brush. Prior patent misuse decisions had involved attempts "to secure a partial monopoly in supplies consumed . . . or unpatented materials employed" in connection with the practice of the invention. None, however, had involved an integral component necessary to the functioning of the patented system. 320 U. S., at 665. The Court refused, however, to infer any "difference in principle" from this distinction in fact. *Ibid.* Instead, it stated an expansive rule that apparently admitted no exception:

> "The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. . . . The method by which the monopoly is sought to be extended is immaterial. . . . When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts. The contract is not saved by anything in the patent laws because it relates to the invention. If it were, the mere act of the patentee could make the distinctive claim of the patent attach to something which does not possess the quality of invention. Then the patent would be diverted from its statutory purpose and become a ready instrument for economic control in domains where the

anti-trust acts or other laws not the patent statutes define the public policy." *Id.*, at 666.

The Court recognized that its reasoning directly conflicted with *Leeds & Catlin Co.* v. *Victor Talking Machine Co., supra,* and it registered disapproval, if not outright rejection, of that case. 320 U. S., at 668. It also recognized that "[t]he result of this decision, together with those which have preceded it, is to limit substantially the doctrine of contributory infringement." *Id.*, at 669. The Court commented, rather cryptically, that it would not "stop to consider" what "residuum" of the contributory infringement doctrine "may be left." *Ibid.*

*Mercoid II* did not add much to the breathtaking sweep of its companion decision. The Court did reinforce, however, the conclusion that its ruling made no exception for elements essential to the inventive character of a patented combination. "However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device." 320 U. S., at 684.

What emerges from this review of judicial development is a fairly complicated picture, in which the rights and obligations of patentees as against contributory infringers have varied over time. We need not decide how respondent would have fared against a charge of patent misuse at any particular point prior to the enactment of 35 U. S. C. § 271. Nevertheless, certain inferences that are pertinent to the present inquiry may be drawn from these historical developments.

First, we agree with the Court of Appeals that the concepts of contributory infringement and patent misuse "rest on antithetical underpinnings." 599 F. 2d, at 697. The traditional remedy against contributory infringement is the injunction. And an inevitable concomitant of the right to enjoin another from contributory infringement is the capacity to suppress competition in an unpatented article of commerce. See, *e. g.,*

*Thomson-Houston Electric Co.* v. *Kelsey Electric R. Specialty Co.*, 72 F. 1016, 1018–1019 (CC Conn. 1896). Proponents of contributory infringement defend this result on the grounds that it is necessary for the protection of the patent right, and that the market for the unpatented article flows from the patentee's invention. They also observe that in many instances the article is "unpatented" only because of the technical rules of patent claiming, which require the placement of an invention in its context. Yet suppression of competition in unpatented goods is precisely what the opponents of patent misuse decry.[14] If both the patent misuse and contributory infringement doctrines are to coexist, then, each must have some separate sphere of operation with which the other does not interfere.

Second, we find that the majority of cases in which the patent misuse doctrine was developed involved undoing the damage thought to have been done by *A. B. Dick*. The desire to extend patent protection to control of staple articles of commerce died slowly, and the ghost of the expansive contributory infringement era continued to haunt the courts. As a result, among the historical precedents in this Court, only the *Leeds & Catlin* and *Mercoid* cases bear significant factual similarity to the present controversy. Those cases involved questions of control over unpatented articles that were essential to the patented inventions, and that were unsuited for any commercial noninfringing use. In this case, we face similar questions in connection with a chemical, pro-

---

[14] Even in the classic contributory infringement case of *Wallace* v. *Holmes*, 29 F. Cas. 74 (No. 17,100) (CC Conn. 1871), the patentee's effort to control the market for the novel burner that embodied his invention arguably constituted patent misuse. If the patentee were permitted to prevent competitors from making and selling that element, the argument would run, he would have the power to erect a monopoly over the production and sale of the burner, an unpatented element, even though his patent right was limited to control over use of the burner in the claimed combination.

panil, the herbicidal properties of which are essential to the advance on prior art disclosed by respondent's patented process. Like the record disc in *Leeds & Catlin* or the stoker switch in the *Mercoid* cases, and unlike the dry ice in *Carbice* or the bituminous emulsion in *Leitch,* propanil is a nonstaple commodity which has no use except through practice of the patented method. Accordingly, had the present case arisen prior to *Mercoid,* we believe it fair to say that it would have fallen close to the wavering line between legitimate protection against contributory infringement and illegitimate patent misuse.

### III

The *Mercoid* decisions left in their wake some consternation among patent lawyers [15] and a degree of confusion in the lower courts. Although some courts treated the *Mercoid* pronouncements as limited in effect to the specific kind of licensing arrangement at issue in those cases, others took a much more expansive view of the decision.[16] Among the

---

[15] See, *e. g.,* Mathews, Contributory Infringement and the Mercoid Case, 27 J. Pat. Off. Soc. 260 (1945); Wiles, Joint Trespasses on Patent Property, 30 A. B. A. J. 454 (1944); Wood, The Tangle of Mercoid Case Implications, 13 Geo. Wash. L. Rev. 61 (1944); Comment, 42 Mich. L. Rev. 915 (1944).

[16] Compare, *e. g., Harris* v. *National Machine Works, Inc.,* 171 F. 2d 85, 89–90 (CA10 1948), cert. denied, 336 U. S. 905 (1949); *Florence-Mayo Nuway Co.* v. *Hardy,* 168 F. 2d 778, 785 (CA4 1948); *Aeration Processes, Inc.* v. *Walter Kidde & Co.,* 77 F. Supp. 647, 654 (WDNY 1948); *Detroit Lubricator Co.* v. *Toussaint,* 57 F. Supp. 837, 838 (ND Ill. 1944); and *Hall* v. *Montgomery Ward & Co.,* 57 F. Supp. 430, 437–438 (ND W. Va. 1944), with *Galion Metallic Vault Co.* v. *Edward G. Budd Mfg. Co.,* 169 F. 2d 72, 75–76 (CA3), cert. denied, 335 U. S. 859 (1948); *Chicago Pneumatic Tool Co.* v. *Hughes Tool Co.,* 61 F. Supp. 767, 769 (Del. 1945), aff'd, 156 F. 2d 981 (CA3), cert. denied, 329 U. S. 781 (1946); *Landis Machinery Co.* v. *Chaso Tool Co.,* 141 F. 2d 800, 801 (CA6), cert. denied, 323 U. S. 720 (1944); *Master Metal Strip Service, Inc.* v. *Protex Weatherstrip Mfg. Co.,* 75 USPQ 32, 34–35 (ND Ill. 1947); and *Stroco Products, Inc.* v. *Mullenbach,* 67 USPQ 168, 170 (SD Cal. 1944).

latter group, some courts held that even the filing of an action for contributory infringement, by threatening to deter competition in unpatented materials, could supply evidence of patent misuse. See, *e. g., Stroco Products, Inc.* v. *Mullenbach,* 67 USPQ 168, 170 (SD Cal. 1944). This state of affairs made it difficult for patent lawyers to advise their clients on questions of contributory infringement and to render secure opinions on the validity of proposed licensing arrangements. Certain segments of the patent bar eventually decided to ask Congress for corrective legislation that would restore some scope to the contributory infringement doctrine. With great perseverance, they advanced their proposal in three successive Congresses before it eventually was enacted in 1952 as 35 U. S. C. § 271.

### A

The critical inquiry in this case is how the enactment of § 271 affected the doctrines of contributory infringement and patent misuse. Viewed against the backdrop of judicial precedent, we believe that the language and structure of the statute lend significant support to Rohm & Haas' contention that, because § 271 (d) immunizes its conduct from the charge of patent misuse, it should not be barred from seeking relief. The approach that Congress took toward the codification of contributory infringement and patent misuse reveals a compromise between those two doctrines and their competing policies that permits patentees to exercise control over nonstaple articles used in their inventions.

Section 271 (c) identifies the basic dividing line between contributory infringement and patent misuse. It adopts a restrictive definition of contributory infringement that distinguishes between staple and nonstaple articles of commerce. It also defines the class of nonstaple items narrowly. In essence, this provision places materials like the dry ice of the *Carbice* case outside the scope of the contributory infringement doctrine. As a result, it is no longer necessary to resort

to the doctrine of patent misuse in order to deny patentees control over staple goods used in their inventions.

The limitations on contributory infringement written into § 271 (c) are counterbalanced by limitations on patent misuse in § 271 (d). Three species of conduct by patentees are expressly excluded from characterization as misuse. First, the patentee may "deriv[e] revenue" from acts that "would constitute contributory infringement" if "performed by another without his consent." This provision clearly signifies that a patentee may make and sell nonstaple goods used in connection with his invention. Second, the patentee may "licens[e] or authoriz[e] another to perform acts" which without such authorization would constitute contributory infringement. This provision's use in the disjunctive of the term "authoriz[e]" suggests that more than explicit licensing agreements is contemplated. Finally, the patentee may "enforce his patent rights against . . . contributory infringement." This provision plainly means that the patentee may bring suit without fear that his doing so will be regarded as an unlawful attempt to suppress competition. The statute explicitly states that a patentee may do "one or more" of these permitted acts, and it does not state that he must do any of them.

In our view, the provisions of § 271 (d) effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods. A patentee may sell a nonstaple article himself while enjoining others from marketing that same good without his authorization. By doing so, he is able to eliminate competitors and thereby to control the market for that product. Moreover, his power to demand royalties from others for the privilege of selling the nonstaple item itself implies that the patentee may control the market for the nonstaple good; otherwise, his "right" to sell licenses for the marketing of the nonstaple good would be meaningless, since no one would be willing to pay him for a superfluous authorization. See Note, 70 Yale. L. J. 649, 659 (1961).

Rohm & Haas' conduct is not dissimilar in either nature or effect from the conduct that is thus clearly embraced within § 271 (d). It sells propanil; it authorizes others to use propanil; and it sues contributory infringers. These are all protected activities. Rohm & Haas does *not* license others to sell propanil, but nothing on the face of the statute requires it to do so. To be sure, the sum effect of Rohm & Haas' actions is to suppress competition in the market for an unpatented commodity. But as we have observed, in this its conduct is no different from that which the statute expressly protects.

The one aspect of Rohm & Haas' behavior that is not expressly covered by § 271 (d) is its linkage of two protected activities—sale of propanil and authorization to practice the patented process—together in a single transaction. Petitioners vigorously argue that this linkage, which they characterize pejoratively as "tying," supplies the otherwise missing element of misuse. They fail, however, to identify any way in which this "tying" of two expressly protected activities results in any extension of control over unpatented materials beyond what § 271 (d) already allows. Nevertheless, the language of § 271 (d) does not explicitly resolve the question when linkage of this variety becomes patent misuse. In order to judge whether this method of exploiting the patent lies within or without the protection afforded by § 271 (d), we must turn to the legislative history.

## B

Petitioners argue that the legislative materials indicate at most a modest purpose for § 271. Relying mainly on the Committee Reports that accompanied the "Act to Revise and Codify the Patent Laws" (1952 Act), 66 Stat. 792, of which § 271 was a part, petitioners assert that the principal purpose of Congress was to "clarify" the law of contributory infringement as it had been developed by the courts, rather than to effect any significant substantive change. They note that

the 1952 Act undertook the major task of codifying all the patent laws in a single title, and they argue that substantive changes from recodifications are not lightly to be inferred. See *United States* v. *Ryder,* 110 U. S. 729, 739–740 (1884). They further argue that, whatever the impact of § 271 in other respects, there is not the kind of "clear and certain signal from Congress" that should be required for an extension of patent privileges. See *Deepsouth Packing Co.* v. *Laitram Corp.,* 406 U. S. 518, 531 (1972). We disagree with petitioners' assessment. In our view, the relevant legislative materials abundantly demonstrate an intent both to change the law and to expand significantly the ability of patentees to protect their rights against contributory infringement.

The 1952 Act was approved with virtually no floor debate. Only one exchange is relevant to the present inquiry. In response to a question whether the Act would effect any substantive changes, Senator McCarran, a spokesman for the legislation, commented that the Act "codif[ies] the patent laws." 98 Cong. Rec. 9323 (1952). He also submitted a statement, which explained that, although the general purpose of the Act was to clarify existing law, it also included several changes taken "[i]n view of decisions of the Supreme Court and others." *Ibid.* Perhaps because of the magnitude of the recodification effort, the Committee Reports accompanying the 1952 Act also gave relatively cursory attention to its features. Nevertheless, they did identify § 271 as one of the "major changes or innovations in the title." H. R. Rep. No. 1923, 82d Cong., 2d Sess., 5 (1952).[17] In explaining the provisions of § 271, the Reports stated that they were intended "to codify in statutory form the principles of contributory infringement and at the same time [to] eliminate . . . doubt and confusion" that had resulted from "decisions of the courts

---

[17] The House and Senate Committee Reports in their significant parts were identical. See S. Rep. No. 1979, 82d Cong., 2d Sess. (1952). We confine the citations in the text, therefore, to the House Report.

in recent years." *Id.*, at 9. The Reports also commented that §§ 271 (b), (c), and (d) "have as their main purpose clarification and stabilization." *Ibid.*

These materials sufficiently demonstrate that the 1952 Act did include significant substantive changes, and that § 271 was one of them.

The principal sources for edification concerning the meaning and scope of § 271, however, are the extensive hearings that were held on the legislative proposals that led up to the final enactment. In three sets of hearings over the course of four years, proponents and opponents of the legislation debated its impact and relationship with prior law. Draftsmen of the legislation contended for a restriction on the doctrine of patent misuse that would enable patentees to protect themselves against contributory infringers. Others, including representatives of the Department of Justice, vigorously opposed such a restriction.

Although the final version of the statute reflects some minor changes from earlier drafts, the essence of the legislation remained constant. References were made in the later hearings to testimony in the earlier ones.[18] Accordingly, we regard each set of hearings as relevant to a full understanding of the final legislative product. Cf., *e. g., Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 390 (1951); *Transcontinental & Western Air, Inc.* v. *CAB*, 336 U. S. 601, 605–606, n. 6 (1949). Together, they strongly reinforce the conclusion that § 271 (d) was designed to immunize from the charge of patent misuse behavior similar to that in which the respondent has engaged.

1. *The 1948 Hearings.* The first bill underlying § 271 was H. R. 5988, proposed to the 80th Congress. During the hearings on this bill its origin and purpose were carefully ex-

---

[18] See, *e. g.*, Hearings on H. R. 3760 before Subcommittee No. 3 of the House Committee on the Judiciary, 82d Cong., 1st Sess., 150–151 (1951) (1951 Hearings) (testimony of Giles Rich).

plained. The New York Patent Law Association, which had supervised drafting of the legislation, submitted a prepared memorandum that candidly declared that the purpose of the proposal was to reverse the trend of Supreme Court decisions that indirectly had cut back on the contributory infringement doctrine. Hearings on H. R. 5988, etc., before the Subcommittee on Patents, Trade-Marks, and Copyrights of the House Committee on the Judiciary, 80th Cong., 2d Sess., 4 (1948) (1948 Hearings). The memorandum explained the rationale behind contributory infringement, and it gave as one example of its proper application the protection of a patent for use of a chemical:

> "[O]ne who supplies a hitherto unused chemical to the public for use in a new method is stealing the benefit of the discovery of the property of this chemical which made the new method possible. To enjoin him from distributing the chemical for use in the new method does not prevent him from doing anything which he could do before the new property of the chemical had been discovered." *Ibid.*

It criticized several decisions, including *Leitch* and *Carbice* as well as the two *Mercoids*, on the ground that together they had effectively excluded such "new-use inventions" from the protections of the patent law. 1948 Hearings, at 4–5. It went on to explain that the proposed legislation was designed to counteract this effect by providing that "the mere use or enforcement of the right to be protected against contributory infringement . . . shall not be regarded as misuse of the patent." *Id.,* at 6. This approach, the memorandum stated, "does away with the ground on which the Supreme Court has destroyed the doctrine of contributory infringement" and "is essential to make the rights against contributory infringers which are revived by the statute practically useful and enforceable." *Ibid.*

Testimony by proponents of the bill developed the same

theme. Giles Rich, then a prominent patent lawyer, was one of the draftsmen. He highlighted the tension between the judicial doctrines of contributory infringement and patent misuse. He stated that early patent misuse decisions "seem to us now to have been just," but that "this doctrine has been carried too far—so far that it . . . has practically eliminated from the law the doctrine of contributory infringement as a useful legal doctrine." *Id.,* at 9. To illustrate this point, he contrasted the *Carbice* and *Mercoid* cases, and noted that the latter had involved an item without any noninfringing use. Because it incorporated a staple-nonstaple distinction in the definition of contributory infringement, Mr. Rich argued that the bill would "correct [the] situation" left by *Mercoid* "without giving sanction to practices such as those in the Carbice case." 1948 Hearings, at 11.

Rich's testimony was followed by that of Robert W. Byerly, another draftsman. He stressed the confusion in which the *Mercoid* decisions had left the lower courts, and the need for Congress to define the scope of protection against contributory infringement by drawing a clear line between deliberate taking of another's invention and legitimate trade in staple articles of commerce. *Id.,* at 13–16. Byerly discussed the practical difficulties some patentees would encounter if suits against direct infringers were their only option to protect against infringement. *Id.,* at 13–14. He argued that the breadth of the Court's misuse decision in *Mercoid I* could be discerned from the fact that it "overruled" *Leeds & Catlin.* 1948 Hearings, at 14. He explained the section of the bill restricting the scope of patent misuse as intended to give the patentee recourse to either or both of two options: "A man can either say, 'you cannot sell the part of my invention to somebody else to complete it,' or he can say, 'yes, you can sell the part of my invention to help others complete it provided you pay me a royalty.'" *Id.,* at 16.

The bill attracted opponents as well, some of whom de-

fended the result of the *Mercoid* decisions.[19]   In addition, Roy C. Hackley, Jr., Chief of the Patent Section, Department of Justice, made an appearance on behalf of the Department.   He took the position that statutory clarification of the scope of contributory infringement was desirable, but he warned Congress against using language that might "permit illegal extension of the patent monopoly."   1948 Hearings, at 69.   On this ground he opposed the portion of the proposed bill that included language substantially similar to what is now § 271 (d).   *Ibid.*

2. *The 1949 Hearings.*   The 1948 bill did not come to a vote, but the patent bar resubmitted its proposal in 1949. Again, there were fairly extensive hearings, with debate, and again Rich led the list of favorable witnesses.   He renewed his attempt to explain the legislation in terms of past decisions of this Court.   The result in the· *Carbice* case, he argued, was proper because the patentee had tried to interfere with the market in an old and widely used product.   On the other hand, he cited the *Mercoid* cases as examples of a situation where "[t]here is no practical way to enforce that patent, except through a suit for contributory infringement against the party who makes the thing which is essentially the inventive subject matter [and] which, when put into use, creates infringement."   Hearings on H. R. 3866 before Subcommittee No. 4 of the House Committee on the Judiciary, 81st Cong., 1st Sess., 11 (1949) (1949 Hearings).

To restore the doctrine of contributory infringement where it was most needed, Rich· argued, it was essential to restrict *pro tanto* the judicially created doctrine of patent misuse:

> "I would like to recall that we are dealing with a problem which involves a conflict between two doctrines, contributory infringement and misuse.

---

[19] See, *e. g.,* the testimony of I. E. McCabe, Chief Engineer of Mercoid Corp.  1948 Hearings, at 55–59.  McCabe also testified at length in the 1949 and 1951 Hearings.

"It is crystal clear, when you have thoroughly studied this subject, that the only way you can make contributory infringement operative again as a doctrine, is to make some exceptions to the misuse doctrine and say that certain acts shall not be misuse. Then contributory infringement, which is there all the time, becomes operative again.

"Contributory infringement has been destroyed by the misuse doctrine; and to revive it you do not have to do anything with contributory infringement itself. You go back along the same road until you get to the point where you have contributory infringement working for you again." *Id.*, at 13–14.

Rich warned against going too far. He took the position that a law designed to reinstate the broad contributory infringement reasoning of *Henry* v. *A. B. Dick Co.*, 224 U. S. 1 (1912), "would kill itself in time." 1949 Hearings, at 17. The proposed legislation, however, "stopped short of that" and "said that you can control only things like the switches in the Mercoid case, which are especially made or adapted for use in connection with such patent and which are not suitable for actual, commercial, noninfringing use." *Ibid.*

In the 1949 Hearings, the Department of Justice pressed more vigorous opposition to the contributory infringement proposal than it had in 1948. Represented by John C. Stedman, Chief, Legislation and Clearance Section, Antitrust Division, the Department argued that legislation was unnecessary because the *Mercoid* decisions were correct, because they had not produced as much confusion as the proponents of the new legislation claimed, and because the legislation would produce new interpretive problems. 1949 Hearings, at 50–56. Stedman defended the result of the *Mercoid* decisions on the ground that marketing techniques employed in those cases were indistinguishable in effect from tying schemes previously considered by the Court. He took the view that the staple-

nonstaple distinction should be irrelevant for purposes of patent misuse. "If the owner of the patent is using his patent in a way to prevent the sale of unpatented elements, then the misuse doctrine would apply." 1949 Hearings, at 54. Stedman added that the effect of the legislation would be to revive the *Leeds & Catlin* decision, a result the Department of Justice opposed. 1949 Hearings, at 59. Later in the hearings, he offered several methods of exploiting patent rights that arguably would eliminate the need for the contributory infringement doctrine, and he stated that a suit for contributory infringement could involve patent misuse, even if there were no conditional licensing of patent rights. *Id.*, at 76–77.

After Stedman's opening testimony, Rich was recalled for further questioning. Rich agreed with Stedman's assessment of the effect that the legislation would have, but argued that the Justice Department's arguments ignored the bill's limitation of contributory infringement to nonstaple articles. To clarify the effect of the statute, Rich declared:

> "[I]t· is absolutely necessary, to get anywhere in the direction we are trying to go, to make some exception to the misuse doctrine because it is the conflict between the doctrine of contributory infringement and the doctrine of misuse that raises the problem." *Id.*, at 67.

He added:

> "The exception which we wish to make to the misuse doctrine would reverse the result in the Mercoid case; it would not reverse the result in the Carbice case." *Ibid.*

In response to questioning, Rich agreed that the bill would preserve both the contributory infringement and misuse doctrines as they had existed in this Court's cases prior to the *Mercoid* decisions. 1949 Hearings, at 68. He asserted that the method by which the patentee's invention was exploited in *Mercoid* was necessary given the nature of the businesses involved. 1949 Hearings, at 69. When asked whether the

proposed legislation would allow that kind of licensing activity, Rich responded with an unqualified "Yes." *Ibid.*

3. *The 1951 Hearings.* By the time the proposal for a statutory law of contributory infringement and patent misuse was presented to the 82d Congress, the battle lines of the earlier hearings had solidified substantially, and the representatives of the patent bar once again found themselves faced with the formidable opposition of the Department of Justice.

In his opening remarks before the 1951 Hearings, Rich reminded the congressional Subcommittee that, as a practical matter, it was necessary to deal with the contributory infringement and the misuse doctrines as a unit "if we are to tackle the problem at all." 1951 Hearings, at 152. He urged on the Subcommittee the need to eliminate confusion in the law left by the *Mercoid* decisions by drawing a "sensible line" between contributory infringement and patent misuse that would be "in accordance with public policy as it seems to exist today." 1951 Hearings, at 152. Rich also attempted to play down the controversiality of the proposal by arguing that a restrictive definition of contributory infringement had been incorporated into the bill. *Id.,* at 153–154.

When questioned about the effect of the bill on present law, Rich replied that it would not extend the contributory infringement doctrine unless "you take the point of view that there is no such things [*sic*] as contributory infringement today." *Id.,* at 158. He rejected the suggestion that the legislation would return the law of contributory infringement to the *A. B. Dick* era, and he reminded the Subcommittee that the law "would not touch the result of the Carbice decision." 1951 Hearings, at 161. Rich concluded his opening testimony with this explanation of subsection (d):

"It deals with the misuse doctrine, and the reason it is necessary is that the Supreme Court has made it abundantly clear that there exist in the law today two doc-

trines, contributory infringement on the one hand, and misuse on the other, and that, where there is a conflict, the misuse doctrine must prevail because of the public interest inherently involved in patent cases.

"Other decisions following Mercoid have made it quite clear that at least some courts are going to say that any effort whatever to enforce a patent against a contributory infringer is in itself misuse. . . . Therefore we have always felt—we who study this subject particularly—that to put any measure of contributory infringement into law you must, to that extent and to that extent only, specifically make exceptions to the misuse doctrine, and that is the purpose of paragraph (d).

"It goes with, supports, and depends upon paragraph (c)." *Id.*, at 161–162.

The Department of Justice, now represented by Wilbur L. Fugate of the Antitrust Division, broadly objected to "writing the doctrine of contributory infringement into the law." *Id.*, at 165. Its most strenuous opposition was directed at what was to become § 271 (d). Fugate warned that this provision "would have the effect of wiping out a good deal of the law relating to misuse of patents, particularly with reference to tying-in clauses." *Ibid.* He repeatedly asserted that the language of subsection (d) was unclear, and that it was impossible to tell how far it would serve to insulate patentees from charges of misuse. See *id.*, at 167–169. But as the Department construed it, the subsection would "seriously impair the doctrine of misuse of patents in favor of the doctrine of contributory infringements." *Id.*, at 168. Fugate would not say that any of the three acts protected by subsection (d) were *per se* illegal, but he felt that they could become evidence of misuse in some contexts. *Id.*, at 168–169.

When Representative Crumpacker challenged Fugate's interpretation of the statute, Fugate replied that Rich had advanced the same construction, and he called upon Rich to

say whether he agreed. *Id.,* at 169. The following colloquy then took place:

> "Mr. RICH: I will agree with [Mr. Fugate's interpretation] to this extent: That as I testified it is necessary to make an exception to misuse to the extent that you revive contributory infringement in paragraph (c), and this whole section (d) is entirely dependent on (c). Where (d) refers to contributory infringement, it only refers to contributory infringement as defined in (c) and nothing more.
>
> "Mr. CRUMPACKER: In other words, all it says is that bringing an action against someone who is guilty of contributory infringement is not a misuse of the patent.
>
> "Mr. RICH: That is true." *Ibid.*

Rich and Fugate then discussed the law in the courts before and after the *Mercoid* decisions. In an effort to clarify the intendment of the statute, Congressman Rogers asked Rich to identify misuse decisions exemplifying the acts specified in the three parts of subsection (d). Rich identified the *Leitch* and *Carbice* cases as examples of situations where deriving revenue from acts that would be contributory infringement was held to be evidence of misuse; he stated that the *Mercoid* cases exemplified misuse from licensing others; and he referred to *Stroco Products, Inc.* v. *Mullenbach, supra,* as an example of a case where the mere bringing of an action against contributory infringers was found to exemplify misuse. 1951 Hearings, at 174–175. He again reminded the Subcommittee that the scope of subsection (d) was implicitly limited by the restrictive definition of contributory infringement in subsection (c), and he assured the Subcommittee that "[i]f [a patentee] has gone beyond those and done other acts which could be misuse, then the misuse doctrine would be applicable." *Id.,* at 175. As an example of such "other acts," he suggested that a patentee would be guilty of misuse if he tried to license others to produce staple articles used in a patented invention. *Ibid.*

## C

Other legislative materials that we have not discussed bear as well on the meaning to be assigned to § 271 (d); but the materials that we have culled are exemplary, and they amply demonstrate the intended scope of the statute. It is the consistent theme of the legislative history that the statute was designed to accomplish a good deal more than mere clarification. It significantly changed existing law, and the change moved in the direction of expanding the statutory protection enjoyed by patentees. The responsible congressional Committees were told again and again that contributory infringement would wither away if the misuse rationale of the *Mercoid* decisions remained as a barrier to enforcement of the patentee's rights. They were told that this was an undesirable result that would deprive many patent holders of effective protection for their patent rights. They were told that Congress could strike a sensible compromise between the competing doctrines of contributory infringement and patent misuse if it eliminated the result of the *Mercoid* decisions yet preserved the result in *Carbice*. And they were told that the proposed legislation would achieve this effect by restricting contributory infringement to the sphere of nonstaple goods while exempting the control of such goods from the scope of patent misuse. These signals cannot be ignored. They fully support the conclusion that, by enacting §§ 271 (c) and (d), Congress granted to patent holders a statutory right to control nonstaple goods that are capable only of infringing use in a patented invention, and that are essential to that invention's advance over prior art.

We find nothing in this legislative history to support the assertion that respondent's behavior falls outside the scope of § 271 (d).[20] To the contrary, respondent has done nothing

---

[20] Petitioners argue that the exchange in the 1951 Hearings among Representative Crumpacker, Mr. Rich, and Mr. Fugate, see *supra*, at 210–212, counters our interpretation of the legislative history. They argue

that would extend its right of control over unpatented goods beyond the line that Congress drew. Respondent, to be sure, has licensed use of its patented process only in connection with purchases of propanil. But propanil is a *nonstaple* product, and its herbicidal property is the heart of respondent's invention. Respondent's method of doing business is thus essentially the same as the method condemned in the *Mercoid* decisions, and the legislative history reveals that § 271 (d) was designed to retreat from *Mercoid* in this regard.

There is one factual difference between this case and *Mercoid*: the licensee in the *Mercoid* cases had offered a sublicense to the alleged contributory infringer, which offer had been refused. *Mercoid II,* 320 U. S., at 683. Seizing upon this difference, petitioners argue that respondent's unwillingness to offer similar licenses to its would-be competitors in the manufacture of propanil legally distinguishes this case and sets it outside § 271 (d). To this argument, there are at

---

that Mr. Fugate initially interpreted § 271 (d) to allow tying arrangements, that this constuction was rejected by Crumpacker and disavowed by Rich, and that the contention ultimately was dropped by the Department of Justice. Although the relevant passage is not entirely free from doubt, we do not find petitioners' interpretation of it particularly persuasive. Rather, it appears that Fugate initially interpreted the statute to insulate the patentee from *any*. charge of misuse so long as he also engaged in at least one of the practices specified in the statute. See 1951 Hearings, at 167. Representative Crumpacker demurred from this interpretation, and Rich reminded the Subcommittee of the limitation implicitly built into the scope of § 271 (d) by the restrictive definition of contributory infringement in § 271 (c). 1951 Hearings, at 169. Rich subsequently did state that an attempt to secure a monopoly on "unpatented articles" still would be patent misuse. *Id.,* at 172–173. But in the context of his clarification regarding the scope of subsection (c), his agreement to this proposition appears to be based on an assumption that the unpatented articles referred to were staples of commerce. Taken as a whole, this exchange suggests that § 271 (d) would afford no defense to a charge of misuse for an attempt to control staple materials; it does not, in our view, support the further conclusion that an attempt to control nonstaple materials should be subject to the same charge.

least three responses. First, as we have noted, § 271 (d) permits such licensing but does not require it. Accordingly, petitioners' suggestion would import into the statute a requirement that simply is not there. Second, petitioners have failed to adduce any evidence from the legislative history that the offering of a license to the alleged contributory infringer was a critical factor in inducing Congress to retreat from the result of the *Mercoid* decisions. Indeed, the *Leeds & Catlin* decision, which did not involve such an offer to license, was placed before Congress as an example of the kind of contributory infringement action the statute would allow. Third, petitioners' argument runs contrary to the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention. 35 U. S. C. § 154; see *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.,* 210 U. S. 405, 424–425 (1908); *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 135 (1969). If petitioners' argument were accepted, it would force patentees either to grant licenses or to forfeit their statutory protection against contributory infringement. Compulsory licensing is a rarity in our patent system,[21] and we decline to manufacture such a requirement out of § 271 (d).

## IV

Petitioners argue, finally, that the interpretation of § 271 (d) which we have adopted is foreclosed by decisions of this

---

[21] Compulsory licensing of patents often has been proposed, but it has never been enacted on a broad scale. See, *e. g.,* Compulsory Licensing of Patents under some Non-American Systems, Study of the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 85th Cong., 2d Sess., 1, 2 (Comm. Print 1959). Although compulsory licensing provisions were considered for possible incorporation into the 1952 revision of the patent laws, they were dropped before the final bill was circulated. See House Committee on the Judiciary, Proposed Revision and Amendment of the Patent Laws: Preliminary Draft, 81st Cong., 2d Sess., 91 (Comm. Print 1950).

Court following the passage of the 1952 Act. They assert that in subsequent cases the Court has continued to rely upon the *Mercoid* decisions, and that it has effectively construed § 271 (d) to codify the result of those decisions, rather than to return the doctrine of patent misuse to some earlier stage of development. We disagree.

The cases to which petitioners turn for this argument include some that have cited the *Mercoid* decisions as evidence of a general judicial "hostility to use of the statutorily granted patent monopoly to extend the patentee's economic control to unpatented products." *United States* v. *Loew's, Inc.,* 371 U. S. 38, 46 (1962); see also *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 343–344 (1971). These decisions were not directly concerned with the doctrine of contributory infringement, and they did not require the Court to evaluate § 271 (d) or its impact on the holdings in *Mercoid.* Like other cases that do not specifically mention those decisions, see, *e. g., Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S., at 136, they state the general thrust of the doctrine of patent misuse without attending to its specific statutory limitations.

In another case, *Deepsouth Packing Co.* v. *Laitram Corp.,* 406 U. S. 518 (1972), the Court dealt only with the scope of direct infringement under § 271 (a). The question under consideration was whether a patent is infringed when unpatented elements are assembled into the combination outside the United States. The Court held that such assembly would not have constituted direct infringement prior to the enactment of § 271 (a). and it concluded that enactment of the statute effected no change in that regard. The Court cited *Mercoid I* for the well-established proposition that unless there has been direct infringement there can be no contributory infringement. 406 U. S., at 526. Again, the Court did not have occasion to focus on the meaning of § 271 (d).

The only two decisions that touch at all closely upon the issues of statutory construction presented here are *Aro Mfg.*

*Co. v. Convertible Top Co.,* 365 U. S. 336 (1961) (*Aro I*), and *Aro Mfg. Co. v. Convertible Top Co.,* 377 U. S. 476 (1964) (*Aro II*). These decisions emerged from a single case involving an action for contributory infringement based on the manufacture and sale of a specially cut fabric designed for use in a patented automobile convertible top combination. In neither case, however, did the Court directly address the question of § 271 (d)'s effect on the law of patent misuse.

The controlling issue in *Aro I* was whether there had been any *direct* infringement of the patent. The Court held that purchasers of the specially cut fabric used it for "repair" rather than "reconstruction" of the patented combination; accordingly, under the patent law they were not guilty of infringement. 365 U. S., at 340, 346. Since there was no direct infringement by the purchasers, the Court held that there could be no contributory infringement by the manufacturer of the replacement tops. This conclusion rested in part on a holding that § 271 (c) "made no change in the fundamental precept that there can be no contributory infringement in the absence of a direct infringement." *Id.,* at 341. It in no way conflicts with our decision.

As petitioners observe, *Aro I* does quote certain passages from the *Mercoid* decisions standing for the proposition that even single elements constituting the heart of a patented combination are not within the scope of the patent grant. 365 U. S., at 345. In context, these references to *Mercoid* are not inconsonant with our view of § 271 (d). In the course of its decision, the Court eschewed the suggestion that the legal distinction between "reconstruction" and "repair" should be affected by whether the element of the combination that has been replaced is an "essential" or "distinguishing" part of the invention. 365 U. S., at 344. The Court reasoned that such a standard would "ascrib[e] to one element of the patented combination the status of patented invention in itself," and it drew from the *Mercoid* cases only to the extent that they described limitations on the scope of the patent

grant. 365 U. S., at 344–345. In a footnote, the Court carefully avoided reliance on the misuse aspect of those decisions. *Id.*, at 344, n. 10. Accordingly, it had no occasion to consider whether or to what degree § 271 (d) undermined the validity of the *Mercoid* patent misuse rationale.[22]

*Aro II* is a complicated decision in which the Court mustered different majorities in support of various aspects of its opinion. See 377 U. S., at 488, n. 8. After remand from *Aro I*, it became clear that the Court's decision in that case had not eliminated all possible grounds for a charge of contributory infringement. Certain convertible top combinations had been sold without valid license from the patentee. Because use of these tops involved direct infringement of the patent, there remained a question whether fabric supplied for their repair might constitute contributory infringement notwithstanding the Court's earlier decision.

*Aro II* decided several questions of statutory interpretation under § 271. First, it held that repair of an unlicensed combination was direct infringement under the law preceding enactment of § 271, and that the statute did not effect any change in this regard. 377 U. S., at 484. Like the constructions of § 271 (a) in *Aro I* and *Deepsouth Packing Co.*, this conclusion concerns a statutory provision not at issue in this case.

Second, the Court held that supplying replacement fabrics specially cut for use in the infringing repair constituted contributory infringement under § 271 (c). The Court held that the specially cut fabrics, when installed in infringing equipment, qualified as nonstaple items within the language of § 271 (c), and that supply of similar materials for infringing repair had been treated as contributory infringement under the judicial law that § 271 (c) was designed to codify. 377

---

[22] In his concurring opinion in *Aro I*, Mr. Justice Black did address the scope of § 271 (d). 365 U. S., at 346, 347–350. His conclusion is inconsistent with today's decision.

U. S., at 485–488.  It also held that § 271 (c) requires a showing that an alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing.  377 U. S., at 488–491.  We regard these holdings as fully consistent with our understanding of § 271 (c).  In any event, since petitioners have conceded contributory infringement for the purposes of this decision, the scope of that subsection is not directly before us.

Third, the Court held that the alleged contributory infringer could not avoid liability by reliance on the doctrine of the *Mercoid* decisions.  Although those decisions had cast contributory infringement into some doubt, the Court held that § 271 was enacted "for the express purpose . . . of overruling any blanket invalidation of the [contributory infringement] doctrine that could be found in the *Mercoid* opinions."  377 U. S., at 492.  Although our review of the legislative history finds a broader intent, it is not out of harmony with *Aro II*'s analysis.  The Court explicitly noted that a defense of patent misuse had not been pressed.  *Id.,* at 491.  Accordingly, its discussion of legislative history was limited to those materials supporting the observation, sufficient for purposes of the case, that any direct attack on the contributory infringement doctrine in its entirety would be contrary to the manifest purpose of § 271 (c).  Since the Court in *Aro II* was not faced with a patent misuse defense, it had no occasion to consider other evidence in the hearings relating to the scope of § 271 (d).

Finally, in a segment of the Court's opinion that commanded full adherence of only four Justices, 377 U. S., at 493–500, it was stated that an agreement in which the patentee had released some purchasers of infringing combinations from liability defeated liability for contributory infringement with respect to replacement of convertible tops after the agreement went into effect.  The plurality rejected the patentee's attempt to condition its release by reserving

"rights in connection with future sales of replacement fabrics." *Id.*, at 496. It relied on the *Carbice* and *Mercoid* decisions, as well as *United States* v. *Loew's, Inc., supra,* for the proposition that a patentee "cannot impose conditions concerning the unpatented supplies, ancillary materials, or components with which the use [of a patented combination] is to be effected." 377 U. S., at 497. This statement is qualified by the circumstances to which it applied. Because the Court already had determined in *Aro I* that replacement of wornout convertible top fabric constituted a permissible repair of the combination, the agreement sought to control an unpatented article in the context of a noninfringing use. The determination that the agreement defeated liability does not reflect resort to the principles of patent misuse; rather it betokens a recognition that the patentee, once it had authorized use of the combination, could not manufacture contributory infringement by contract where under the law there was none.

Perhaps the quintessential difference between the *Aro* decisions and the present case is the difference between the primary-use market for a chemical process and the replacement market out of which the *Aro* litigation arose. The repair-reconstruction distinction and its legal consequences are determinative in the latter context, but are not controlling here. Instead, the staple-nonstaple distinction, which *Aro I* found irrelevant to the characterization of replacements, supplies the controlling benchmark. This distinction ensures that the patentee's right to prevent others from contributorily infringing his patent affects only the market for the invention itself. Because of this significant difference in legal context, we believe our interpretation of § 271 (d) does not conflict with these decisions.

## V

Since our present task is one of statutory construction, questions of public policy cannot be determinative of the outcome

unless specific policy choices fairly can be attributed to Congress itself. In this instance, as we have already stated, Congress chose a compromise between competing policy interests. The policy of free competition runs deep in our law. It underlies both the doctrine of patent misuse and the general principle that the boundary of a patent monopoly is to be limited by the literal scope of the patent claims. But the policy of stimulating invention that underlies the entire patent system runs no less deep. And the doctrine of contributory infringement, which has been called "an expression both of law and morals," *Mercoid I*, 320 U. S., at 677 (Frankfurter, J., dissenting), can be of crucial importance in ensuring that the endeavors and investments of the inventor do not go unrewarded.

It is, perhaps, noteworthy that holders of "new use" patents on chemical processes were among those designated to Congress as intended beneficiaries of the protection against contributory infringement that § 271 was designed to restore. See 1948 Hearings, at 4, 5, 18. We have been informed that the characteristics of practical chemical research are such that this form of patent protection is particularly important to inventors in that field. The number of chemicals either known to scientists or disclosed by existing research is vast. It grows constantly, as those engaging in "pure" research publish their discoveries.[23] The number of these chemicals that have known uses of commercial or social value, in contrast, is small. Development of new uses for existing chemicals is thus a major component of practical chemical research.

---

[23] As of March 1980, the Chemical Registry System maintained by the American Chemical Society listed in excess of 4,848,000 known chemical compounds. The list grows at a rate of about 350,000 per year. The Society estimates that the list comprises between 50% and 60% of all compounds that ever have been prepared. See Brief for American Chemical Society as *Amicus Curiae* 4–5.

It is extraordinarily expensive.[24] It may take years of unsuccessful testing before a chemical having a desired property is identified, and it may take several years of further testing before a proper and safe method for using that chemical is developed.[25]

Under the construction of § 271 (d) that petitioners advance, the rewards available to those willing to undergo the time, expense, and interim frustration of such practical research would provide at best a dubious incentive. Others could await the results of the testing and then jump on the profit bandwagon by demanding licenses to sell the unpatented, nonstaple chemical used in the newly developed process. Refusal to accede to such a demand, if accompanied by any attempt to profit from the invention through sale of the unpatented chemical, would risk forfeiture of any patent protection whatsoever on a finding of patent misuse. As a result, noninventors would be almost assured of an opportunity to share in the spoils, even though they had contributed nothing to the discovery. The incentive to await the discoveries of others might well prove sweeter than the incentive to take the initiative oneself.

---

[24] For example, the average cost of developing one new pharmaceutical drug has been estimated to run as high as $54 million. Hansen, The Pharmaceutical Development Process: Estimates of Development Costs and Times and the Effects of Proposed Regulatory Changes, in Issues in Pharmaceutical Economics 151, 180 (R. Chien ed. 1979).

[25] See Wardell, The History of Drug Discovery, Development, and Regulation, in Issues in Pharmaceutical Economics 1, 8–10 (R. Chien ed. 1979) (describing modern techniques and testing requirements for development of pharmaceuticals). Although testing of chemicals destined for pharmaceutical use may be the most extensive, testing for environmental effects of chemicals used in industrial or agricultural settings also can be both expensive and prolonged. See A. Wechsler, J. Harrison, & J. Neumeyer, Evaluation of the Possible Impact of Pesticide Legislation on Research and Development Activities of Pesticide Manufacturers 18–52 (Environmental Protection Agency, Office of Pesticide Programs, pub. no. 540/9–75–018, 1975). See generally A. Baines, F. Bradbury, & C. Suckling, Research in the Chemical Industry 82–163 (1969).

Whether such a regime would prove workable, as petitioners urge, or would lead to dire consequences, as respondent and several *amici* insist, we need not predict. Nor do we need to determine whether the principles of free competition could justify such a result. Congress' enactment of § 271 (d) resolved these issues in favor of a broader scope of patent protection. In accord with our understanding of that statute, we hold that Rohm & Haas has not engaged in patent misuse, either by its method of selling propanil, or by its refusal to license others to sell that commodity. The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

For decades this Court has denied relief from contributory infringement to patent holders who attempt to extend their patent monopolies to unpatented materials used in connection with patented inventions. The Court now refuses to apply this "patent misuse" principle in the very area in which such attempts to restrain competition are most likely to be successful. The Court holds exempt from the patent misuse doctrine a patent holder's refusal to license others to use a patented process unless they purchase from him an unpatented product that has no substantial use except in the patented process. The Court's sole justification for this radical departure from our prior construction of the patent laws is its interpretation of 35 U. S. C. § 271, a provision that created exceptions to the misuse doctrine and that we have held must be strictly construed "in light of this Nation's historical antipathy to monopoly," *Deepsouth Packing Co.* v. *Laitram Corp.*, 406 U. S. 518, 530 (1972). The Court recognizes, as it must, that § 271 does not on its face exempt the broad category of nonstaple materials from the misuse doctrine, yet construes it to do so based

on what it has gleaned from the testimony of private patent lawyers given in hearings before congressional Committees and from the testimony of Department of Justice attorneys opposing the bill. The Court has often warned that in construing statutes, we should be "extremely wary of testimony before committee hearings and of debates on the floor of Congress save for precise analyses of statutory phrases by the sponsors of the proposed laws." *S&E Contractors, Inc.* v. *United States,* 406 U. S. 1, 13, n. 9 (1972). We have expressed similar reservations about statements of the opponents of a bill: "The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt." *Schwegman Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 394-395 (1951). *NLRB* v. *Fruit Packers,* 377 U. S. 58, 66 (1964). Here, nothing in support of the Court's novel construction is to be found in the Committee Reports or in the statements of those Congressmen or Senators sponsoring the bill. The Court focuses only on the opposing positions of nonlegislators, none of which I find sufficient to constitute that "clear and certain signal from Congress" that is required before construing the 1952 Patent Act to extend the patent monopoly beyond pre-existing standards.

I

All parties to this litigation, as well as the courts below, agree that were it not for § 271 (d), respondent's refusal to license the use of its patent except to those who purchase unpatented propanil from it would be deemed patent misuse and would bar recovery from contributory infringement. 599 F. 2d 685, 688 (CA5 1979). In a long line of decisions commencing with *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502 (1917), this Court has denied recovery to patent holders who attempt to extend their patent monopoly to unpatented materials used in connection with patented inventions. In *Motion Picture Patents* the Court held that

a license to use a patented motion picture projector could not be conditioned on the purchase of unpatented film from the patent holder. The Court emphasized that

> "the exclusive right granted in every patent must be limited to the invention described in the claims of the patent and that it is not competent for the owner of a patent . . . to, in effect, extend the scope of its patent monopoly by restricting the use of it to materials necessary in its operation but which are no part of the patented invention," *id.*, at 516.

Accordingly, the Court refused to enforce the patent against contributory infringers because "it would be gravely injurious to [the] public interest," which it deemed "more a favorite of the law than is the promotion of private fortunes." *Id.*, at 519.[1]

The "patent misuse" doctrine, as it came to be known, was further enunciated in *Carbice Corp.* v. *American Patents Development Corp.*, 283 U. S. 27 (1931). In *Carbice* the Court unanimously denied relief for contributory infringement where a patentee required users of its combination patent to purchase from its exclusive licensee unpatented material (dry ice) that was an essential component of the patented com-

---

[1] The Court rejected the argument that the licensing scheme was justified because it reduced the cost of the patented invention. The Court noted:

"It is argued as a merit of this system of sale . . . that the public is benefited by the sale of the machine at what is practically its cost and by the fact that the owner of the patent makes its entire profit from the sale of the supplies with which it is operated. This fact, if it be a fact, instead of commending, is the clearest possible condemnation of, the practice adopted, for it proves that under color of its patent the owner intends to and does derive its profit, not from the invention on which the law gives it a monopoly but from the unpatented supplies with which it is used and which are wholly without the scope of the patent monopoly, thus in effect extending the power to the owner of the patent to fix the price to the public of the unpatented supplies as effectively as he may fix the price on the patented machine." 243 U. S., at 517.

bination (a container for transporting frozen goods). The Court acknowledged that the owner of the process patent properly could "prohibit entirely the manufacture, sale, or use of such packages," or "grant licenses upon terms consistent with the limited scope of the patent monopoly" and "charge a royalty or license fee." However, the Court concluded that the patent holder "may not exact as the condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor; and if it does so, relief against one who supplies such unpatented materials will be denied." *Id.,* at 31. The Court deemed immaterial the fact that "the unpatented refrigerant is one of the necessary elements of the patented product," for the patent holder had "no right to be free from competition in the sale of solid carbon dioxide" (dry ice) and "this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used." *Id.,* at 33. If the owner of a combination patent were permitted to restrain competition in "unpatented materials used in its manufacture," then "[t]he owner of a patent for a machine might thereby secure a partial monopoly on the unpatented supplies consumed in its operation." *Id.,* at 32.

In *Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458 (1938), the Court, without dissent, denied relief to the holder of a process patent who licensed only those who purchased from it an unpatented material used in the patented process. Rather than expressly tying the grant of a patent license to purchase of unpatented material, the patent holder in *Leitch* merely sold unpatented materials used in the patented process, thereby granting purchasers an implied license to use the patent. The Court deemed this distinction to be "without legal significance" because "every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited." *Id.,* at 463. The Court emphasized that the patent misuse doctrine "applies whatever the nature of the

device by which the owner of a patent seeks to effect such unauthorized extension of the monopoly." *Ibid.*

Four years later, the Court, again without dissent, applied the patent misuse doctrine to prohibit recovery against a direct infringer by a patent holder who required purchasers of a patented product to buy from it unpatented material for use in the patented product. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U. S. 488 (1942). In a companion case the Court denied relief from contributory infringement to a patent holder who licensed only those who purchased from it an unpatented component product specially designed for use in the patented process. *B. B. Chemical Co. v. Ellis,* 314 U. S. 495 (1942). In *B. B. Chemical* the lower courts had rejected the patent owner's attempt to distinguish previous patent misuse cases as involving efforts to control the use of staple materials with substantial noninfringing uses. 117 F. 2d 829, 834–835 (CA1 1941). This Court affirmed without dissent, holding that the patent misuse doctrine barred relief "in view of petitioner's use of the patent as the means of establishing a limited monopoly in its unpatented materials," *B. B. Chemical Co. v. Ellis, supra,* at 497, and necessarily rejecting petitioner's position that patent misuse was limited to staple products and did not apply when the alleged infringer went beyond selling an unpatented staple material and manufactured and sold materials useful only in the patented construct.[2] The Court rejected the patent holder's argument

---

[2] The patent involved in *B. B. Chemical Co. v. Ellis* covered a process for reinforcing shoe insoles by applying to them strips of reinforcing material coated with an adhesive. Rather than expressly licensing shoe manufacturers to use the patented process, the patentee sold them precoated reinforcing material which had been "slit into strips of suitable width for use by the patented method," 314 U. S., at 496, thereby granting purchasers implied licenses to use the patent. The patentee argued in the Court of Appeals for the First Circuit that application of the patent misuse doctrine is limited "to those situations in which the alleged contributory infringer supplies staple articles of commerce." 117 F. 2d 829, 834 (1941). As the Court of Appeals noted, the patentee "insists that where the articles

that it should be able to license only purchasers of the unpatented material because this was the only practicable way to exploit its process patent. "The patent monopoly is not enlarged by reason of the fact that it would be more convenient to the patentee to have it so, or because he cannot

supplied are specially manufactured for use in this particular [patented] process, relief is not to be denied the patentee no matter what his course of business." *Ibid.* The Court of Appeals, expressly agreeing with the Court of Appeals for the Second Circuit and disagreeing with the contrary view of the Court of Appeals for the Ninth Circuit, rejected this view. It noted: "The language of [*Leitch Mfg. Co.* v. *Barber Co.,* 302 U. S. 458 (1938), and *Carbice Corp.* v. *American Patents Development Corp.,* 283 U. S. 27 (1931),] is extremely comprehensive and is by no means restricted to staple articles. . . . There is every indication that the Carbice and Leitch cases apply to specially designed non-patented articles. . . . [T]he emphasis is on the fact that the articles sold by the alleged contributory infringers were not covered by the plaintiff's patent although it conducted its business as though they were." *Id.,* at 834–835.

The patentee-petitioner pursued the staple-nonstaple distinction in its petition for certiorari, arguing that the patent misuse principle of *Carbice Corp.* v. *American Patents Development Corp., supra,* and *Leitch Mfg. Co.* v. *Barber Co., supra,* should not bar relief because the unpatented materials furnished by the defendants were not "staple articles of commerce" but rather were "especially designed and prepared for use in the process of the patent." Pet. for Cert., O. T. 1941, No. 75, p. 10. It also noted the conflict among the Courts of Appeals with respect to nonstaples and patent misuse and urged that certiorari be granted on this basis. The Court granted certiorari, and the Court of Appeals was affirmed over petitioner's arguments that the patent misuse doctrine should not bar relief when the defendant did more than make and sell an unpatented staple. Brief for Petitioner, O. T. 1941, No. 75, pp. 21–22. Petitioner's brief also called attention to the conflict in the cases, *id.,* at 36–37, and both respondents and the United States as *amicus curiae* argued that nonstaples, as well as staples, were subject to the misuse doctrine. Brief for Respondents, O. T. 1941, No. 75, pp. 11–12; Brief for United States as *Amicus Curiae,* O. T. 1941, No. 75, pp. 12–13. The issue was plainly not abandoned and was part and parcel of petitioner's argument that defendant went beyond selling a staple by manufacturing and selling materials expressly designed for and usable only as part of the patented use. The argument was rejected on the authority of the companion case, *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488 (1942).

avail himself of its benefits within the limits of the grant."
314 U. S., at 498. However, the Court reserved the question
whether the patent misuse doctrine would apply if the patent
holder also was willing to license manufacturers who did not
purchase from it the unpatented material. *Ibid.*[3]

These decisions established, even before this Court's deci-
sions in the *Mercoid* cases, *Mercoid Corp.* v. *Mid-Continent
Investment Co.,* 320 U. S. 661 (1944) (*Mercoid I*), and *Mer-
coid Corp.* v. *Minneapolis-Honeywell Regulator Co.,* 320 U. S.
680 (1944) (*Mercoid II*), that the patent misuse doctrine
would bar recovery by a patent holder who refused to license
others to use a patented process unless they purchased from
him an unpatented product for use in the process.[4] Such

---

[3] Two years after *B. B. Chemical,* in *Mercoid Corp.* v. *Mid-Continent
Investment Co.,* 320 U. S. 661 (1944), and *Mercoid Corp.* v. *Minneapolis-
Honeywell Regulator Co.,* 320 U. S. 680 (1944), the Court was confronted
with the question reserved in *B. B. Chemical:* whether the patent misuse
doctrine would apply to a patent holder whose offers to license contribu-
tory infringers had been refused.

[4] Although the Court is willing to concede that *B. B. Chemical* "arguably
involved an application of the misuse doctrine to an attempt to control a
nonstaple material," *ante,* at 194, n. 12, it subsequently states that "among
the historical precedents in this Court, only . . . *Leeds & Catlin* [*Co.* v.
*Victor Talking Machine Co.,* 213 U. S. 325 (1909),] and [the] *Mercoid*
cases bear significant factual similarity to the present controversy." *Ante,*
at 198. The latter statement is particularly puzzling because *B. B. Chemi-
cal,* like this case, involved a patentee's initial refusal to license others to
sell nonstaples, while *Mercoid,* unlike this case, involved a contributory in-
fringer's refusal to accept proffered licenses.

Moreover, the Court implies, *ante,* at 195, n. 13, that until *Mercoid,* there
was division in the Courts of Appeals with regard to whether the patent
misuse doctrine applied to patentees attempting to control nonstaple
items. Yet all of the authorities the Court cites are pre-*B. B. Chemical,*
and it is apparent that in *B. B. Chemical* as in *Mercoid,* the Court
treated staple and nonstaple materials alike insofar as patent misuse was
concerned. It is especially interesting that the Court cites *J. C. Ferguson
Works* v. *American Lecithin Co.,* 94 F. 2d 729, 731 (CA1), cert. denied,
304 U. S. 573 (1938), as a decision supporting the inapplicability of the
misuse doctrine to efforts to control nonstaples. That case was a decision

conduct was deemed patent misuse because it involved an attempt to extend the patent monopoly beyond the scope of the invention to restrain competition in the sale of unpatented materials. This conduct was deemed misuse regardless of whether it was effected by means of express conditions in patent licenses or by a policy of granting only implied licenses to purchasers of unpatented materials, and even though unpatented materials "tied" to the license had no use other than as an integral part of the patented structure.

## II

Respondent's conduct in this case clearly constitutes patent misuse under these pre-*Mercoid* decisions because respondent refuses to license others to use its patented process unless they purchase from it unpatented propanil. The fact that respondent accomplishes this end through the practice of granting implied licenses to those who purchase propanil from it is as devoid of legal significance to alter this conclusion as it was in *Leitch Mfg.* 302 U. S., at 463, and *B. B. Chemical*, 314 U. S., at 498. Moreover, the fact that propanil is a nonstaple product having no substantial use except in the patented process has been without significance at least since *B. B. Chemical* and only serves to reinforce the conclusion that respondent is attempting to extend the patent monopoly to unpatented materials. Because propanil has no substantial noninfringing use, it cannot be sold without incurring liability for contributory infringement unless the vendor has a license to sell propanil or its vendee has an unconditional license to use the patented process. Respondent's refusal to license those who do not purchase propanil from it thus effectively

---

by the Court of Appeals for the First Circuit, and the same Court of Appeals in *B. B. Chemical* expressly indicated that its decision in *J. C. Ferguson* did not imply that the patent misuse doctrine was inapplicable to a patentee's efforts to control nonstaples. 117 F. 2d, at 834–835. In *B. B. Chemical* the Court of Appeals held that the patent misuse doctrine applied to nonstaples as well as staples, and this Court affirmed.

subjects all competing sellers of propanil to liability for contributory infringement. As the Court recognizes, *ante,* at 201, if this conduct is not deemed patent misuse, respondent will acquire the ability "to eliminate competitors and thereby to control the market" for propanil even though propanil is unpatented, unpatentable, and in the public domain.[5] This would permit an even more complete extension of the patent monopoly to a market for unpatented materials than would result from a patentee's attempts to control sales of staples that have substantial alternative uses outside of the patented process.

### III

Despite the undoubted exclusionary impact of respondent's conduct on the market for unpatented propanil, the Court holds that such conduct no longer constitutes patent misuse solely because of congressional enactment of 35 U. S. C. § 271. Section 271 is no stranger to this Court. Our previous attempts to construe this statute have been guided by the principle that "we should not expand patent rights by overruling or modifying our prior cases construing the patent statutes, unless the argument for expansion of privilege is based on more than mere inference from ambiguous statutory language." *Deepsouth Packing Co.* v. *Laitram Corp.,* 406 U. S., at 531. "[I]n light of this Nation's historical antipathy to monopoly," we have concluded that "[w]e would require a clear and certain signal from Congress before approving the position of a litigant who, as respondent here, argues that the beachhead of privilege is wider, and the area of public use narrower, than courts had previously thought." *Id.,* at 530, 531. These principles are not less applicable to, and should

---

[5] Respondent's efforts to use its process patent to exclude, in effect, propanil from the public domain are particularly ironic because in prior litigation respondent successfully maintained, when sued for infringement, that propanil was unpatentable for lack of novelty. *Monsanto Co.* v. *Rohm & Haas Co.,* 456 F. 2d 592 (CA3 1972).

resolve the statutory question presented in, this case, because as the Court concedes, the language of § 271 (d) does not itself resolve the question and because nothing in the legislative materials to which the Court is forced to turn furnishes the necessary evidence of congressional intention.[6]

Section 271 (d) provides:

> "No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

The plain language of § 271 (d) indicates that respondent's conduct is not immunized from application of the patent misuse doctrine. The statute merely states that respondent may (1) derive revenue from sales of unpatented propanil, (2) license others to sell propanil, and (3) sue unauthorized sellers of propanil. While none of these acts can be deemed patent misuse if respondent is "otherwise entitled to relief," the statute does not state that respondent may exclude all competitors from the propanil market by refusing to license all those who do not purchase propanil from it. This is the very conduct that constitutes patent misuse under the tradi-

---

[6] Although the Court acknowledges that we previously have construed § 271, *ante,* at 215–220, it ignores the principles of statutory construction followed in those cases apparently because the cases did not involve the precise question presented in this case. The Court fails to explain, however, why the need for "a clear and certain signal from Congress" is any less urgent in this case.

tional doctrine; thus the fact that respondent may have engaged in one or more of the acts enumerated in § 271 (d) does not preclude its conduct from being deemed patent misuse.

The Court of Appeals conceded that the foregoing would be "a plausible construction" of the statutory language, 599 F. 2d, at 688,[7] yet it chose instead to interpret subsection (d)(1) as granting respondent the "right to exclude others and reserve to itself, if it chooses, the right to sell nonstaples used substantially only in its invention." *Id.*, at 704. The court based this conclusion on the reasoning that "the rights to license another to sell [nonstaple] unpatented items would be rendered worthless if the only right conferred by (d)(1) were the right to sell the item as one competitor among many freely competing." *Id.*, at 703. This reasoning not only ignores the fact that royalties may be collected from competitors selling unpatented nonstaples, who still must obtain licenses from the patentee,[8] but it also is fundamentally inconsistent with the congressional policy "to preserve and foster competition" in the sale of unpatented materials, a policy that, as we have recognized, survived enactment of § 271. *Deepsouth Packing Co.* v. *Laitram Corp., supra,* at 530; *Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 365 U. S. 336 (1961) (*Aro I*); *Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 377 U. S. 476 (1964) (*Aro II*). Subsection (d)(1) leaves respondent free to "deriv[e] revenue" from sales of propanil

---

[7] The Court of Appeals noted not only that petitioner's interpretation of § 271 was "plausible," but also that it is supported by numerous commentators, that "the legislative history [of § 271] is not crystal clear," and that this Court's subsequent construction of § 271 "cut against" its reading of the statute. 599 F. 2d, at 688, 703, 705–706, and n. 29.

[8] Because respondent may collect royalties on these licenses, the right to license competing sellers of propanil is not without economic value. In any event, even if it is more efficient or more profitable for respondent to collect its returns by exacting monopoly profits from the sale of propanil, this does not justify extension of the patent monopoly to the market for unpatented materials. *B. B. Chemical Co.* v. *Ellis,* 314 U. S., at 498; see n. 1, *supra.*

without thereby being deemed guilty of patent misuse; but it does not free respondent to derive monopoly profits from the sale of an unpatented product by refusing to license competitors that do not purchase the unpatented product from it.[9]

The Court acknowledges that respondent refused to license others to sell propanil, but it observes that "nothing on the face of the statute requires it to do so." *Ante,* at 202; cf. *ante,* at 213–214. As much could be conceded, but it would not follow that respondent is absolved from a finding of patent misuse. Section 271 (d) does not define conduct that constitutes patent misuse; rather it simply outlines certain conduct that is not patent misuse. Because the terms of the statute are terms of exception, the absence of any express mention of a licensing requirement does not indicate that respondent's refusal to license others is protected by § 271 (d). This much seems elementary.[10]

---

[9] Like the Court of Appeals, this Court concludes that, despite the silence of the statutory language, § 271 (d) must "effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods." *Ante,* at 201. While it recognizes the anticompetitive impact of such a holding, the Court bases its conclusion on the assertion that the patentee's "power to demand royalties from others for the privilege of selling the nonstaple items itself implies that the patentee may control the market for the nonstaple good; otherwise, his 'right' to sell licenses for the marketing of the nonstaple good would be meaningless, since no one would be willing to pay him for a superfluous authorization." *Ibid.* I fail to see, however, why a license to practice a patented process would in any sense be "superfluous," for, as I have said, competitors selling propanil would still be required to obtain patent licenses from respondent. The fact that royalties could be collected on such licenses might have some effect on the propanil market, but it does not follow that respondent may refuse to grant any licenses, thereby excluding all competitors from the propanil market.

[10] The fact that respondent may not refuse to license competing sellers of propanil who do not purchase the product from it is not inconsistent with the notion that a patent holder is free to suppress his invention or to reserve it entirely to himself. Respondent may discontinue all sales

Nor does the legislative history of § 271 (d) indicate to me that Congress intended to exempt respondent's conduct from application of the patent misuse doctrine. This Court has already addressed this subject and there is at least a rough consensus on the impetus for the congressional action. In *Aro II, supra,* at 492, we held that "Congress enacted § 271 for the express purpose of reinstating the doctrine of contributory infringement as it had been developed by decisions prior to *Mercoid,* and of overruling any blanket invalidation of the doctrine that could be found in the *Mercoid* opinions. See, *e. g.,* 35 U. S. C. §§ 271 (c), (d); Hearings [on H. R. 3760 before Subcommittee No. 3 of House Committee on the Judiciary, 82d Cong., 1st Sess.], 159, 161–162; and the *Aro I* opinions of MR. JUSTICE BLACK, 365 U. S., at 348–349, and nn. 3–4; MR. JUSTICE HARLAN, *id.,* at 378, n. 6; and MR. JUSTICE BRENNAN, *id.,* at 365–367." As Mr. Justice Black stated in *Aro I,* § 271 (d) "was designed specifically to prevent the *Mercoid* case from being interpreted to mean that any effort to enforce a patent against a contributory infringer in itself constitutes a forefeiture of patent rights," 365 U. S., at 349, n. 4 (concurring opinion).

As these passages indicate, and as all parties agree, the impetus for enactment of § 271 was this Court's decisions in the *Mercoid* cases. Each case involved a suit by the owner of a combination patent seeking relief for contributory infringement against a company that had sold an unpatented article useful only in connection with the patented combination. Unlike the situation in *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495 (1942), the alleged contributory infringer in each case had refused an offer of a license "to make, use, and sell" components of the combination patent that was not condi-

---

of propanil and all licensing of its patented process and yet itself continue to use propanil in the patented process without being guilty of patent misuse. But it may not sell propanil to others, thus granting them patent licenses by operation of law, while refusing to license competing sellers of propanil, thus effectively excluding them from the market.

tioned upon the purchase of unpatented materials. *Mid-Continent Investment Co.* v. *Mercoid Corp.*, 133 F. 2d 803, 810 (CA7 1942); *Mercoid II,* 320 U. S., at 682–683. Despite their offers to license, this Court denied relief on the grounds that the patentees were misusing their patents to extend the scope of the patent monopoly to unpatented articles useful only in connection with the patents. Mr. Justice Douglas, speaking for the Court in *Mercoid I,* concluded: "The result of this decision, together with those which have preceded it, is to limit substantially the doctrine of contributory infringement. What residuum may be left we need not stop to consider." 320 U. S., at 669.

In light of the Court's suggestion that the doctrine of contributory infringement might not have survived *Mercoid I,* there was "[c]onsiderable doubt and confusion as to the scope of contributory infringement," H. R. Rep. No. 1923, 82d Cong., 2d Sess., 9 (1952); S. Rep. No. 1979, 82d Cong., 2d Sess., 8 (1952). This confusion was understandable because the *Mercoid* decisions for the first time had applied the patent misuse doctrine to situations where contributory infringers had refused to accept patent licenses that were not conditioned on the purchase of unpatented materials from the patentee. As was indicated in *Aro II, supra,* at 492, the express purpose for the legislation was to reinstate the doctrine of contributory infringement that existed prior to *Mercoid* and to overrule any implication that *Mercoid* made the mere act of suing for contributory infringement a form of patent misuse.

The Court nevertheless follows a course quite at odds with the Court's prior approach to the construction of § 271. Conceding that the language of the section will not itself support its result, the Court turns to the legislative history of the section. It discovers nothing favoring its position in the Committee Reports, the floor debates, or in any materials originating with the legislators who sponsored or managed the bill or who had any other intimate connection with the legislation. The Court is left with the opinions of private patent attorneys

as to the meaning of the proposed legislation and with the hearing testimony of representatives of the Department of Justice opposing the bill. We have generally been reluctant to rely on such citations for definitive guidance in construing legislation; [11] and we should not do so here, particularly when it means departing from the standards announced in our prior cases for construing the 1952 legislation.

However that may be, the testimony of the patent attorneys given in Committee hearings does not support the Court's broad holding that Congress intended to give patent holders complete control over nonstaple materials that otherwise would be in the public domain. Section 271 (c) does declare that selling a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing that the material or apparatus is especially made or especially adapted for use in an infringement of such patent, is contributory infringement, so long as the material or apparatus is not a staple article or commodity of commerce. Making or selling nonstaples especially made or adapted for use in practicing a patent is contributory infringement; but making or selling staples is not, however useful in practicing a patent.[12] But it does not follow that the patentee is never subject to the defense of patent misuse when he seeks to control the sale of a nonstaple used in connection with his patent. Section 271 (d) specifies precisely what acts he may perform with respect to the nonstaple and not be guilty of patent misuse. As the principal witness on whom the Court relies explained, these acts were specified as *exceptions* to what otherwise might have been considered patent misuse under the *Mercoid* decision. Hearings on H. R. 3760 before Subcommittee No. 3 of the

---

[11] *S&E Contractors, Inc.* v. *United States,* 406 U. S. 1, 13, n. 9 (1972).

[12] Section 271 (c)'s limitation of the contributory infringement doctrine to sales of nonstaples does not establish that the exemptions contained in § 271 (d) are relevant only to infringement actions against sellers of nonstaples, for § 271 (d) is equally applicable to infringement actions brought under § 271 (b).

House Committee on the Judiciary. 82d Cong.. 1st Sess.. 161–162 (1951) (hereinafter 1951 Hearings).

The Court offers little to support its position that § 271 (d) was intended to put nonstaples completely beyond the reach of the misuse doctrine. Otherwise, § 271 (c) could simply have stated that the patentee could have his appropriate remedies against contributory infringement as defined in the section without regard to the defense of patent misuse. Of course, this is precisely the result the Court arrives at, but this extends the exemption far beyond what the Committees were told § 271 (d) would effect. Indeed, the representations were that, aside from the exemptions spelled out in § 271 (d), a patentee's control of nonstaples would be subject to the doctrine of patent misuse. *Ibid.*

It is also apparent that the private patent attorneys understood the 1952 Act as not destroying the defense of patent misuse but as confining the defense to its pre-*Mercoid* reach. As I have said, *B. B. Chemical* denied a patentee relief in connection with a nonstaple article but left open whether the same would be true if licenses were available to but were refused by the alleged infringers. In *Mercoid I*, as the patentee in that case emphasized in its brief here, Brief for Respondent Mid-Continent Investment Co., O. T. 1943, Nos. 54 and 55, pp. 31, 39, the defendant-infringer had repeatedly refused licenses, but the Court nevertheless held that the misuse defense barred relief. To this extent, § 271 overturned *Mercoid* and intended to arm the patentee with the power to sue unlicensed contributory infringers selling nonstaple components used in connection with the patented process. But I do not understand the Committee witnesses, when pressed in the 1951 Hearings, to suggest that § 271 (d) authorized the patentee to condition the use of his process on purchasing the unpatented material from him and to exclude from the market all other manufacturers or sellers even though they would be willing to pay a reasonable royalty to the patent owner. For example, after listening to the witness, a member of the Committee

stated: "In other words, all [§ 271 (d)] says is that bringing an action against someone who is guilty of contributory infringement is not a misuse of the patent." The witness's response was: "That is true." 1951 Hearings, at 169.

I have no quarrel with this reading of § 271, but such reading falls far short of insulating the patentee from the misuse defense when he refuses licenses to competing manufacturers of an unpatentable nonstaple and conditions use of his patented process on the user's buying the nonstaple from the patentee itself, thereby employing his patent to profit from the manufacture and sale of an article in the public domain. This was patent misuse before *Mercoid*, and I fail to find convincing evidence in the congressional materials to indicate that Congress intended to overturn the prior law in this respect.[13] It is apparent that the Court overstates the legislative record when it says, *ante*, at 213, that Congress was told not only that contributory infringement would be confined to nonstaples but also that § 271 would exempt the control of such goods from the scope of patent misuse. I find no statement such as this among those quoted or cited by the Court.[14]

---

[13] The fact that § 271 was not intended to work a major repeal of the patent misuse doctrine is reflected in the treatment the legislation received on the floor of the House and Senate. As the Court of Appeals recognized, there was no debate on the House floor and scant comment in the Senate. Just prior to the Senate vote, Senator McCarran, chairman of the Judiciary Committee that had been responsible for the bill in the Senate, was asked by Senator Saltonstall: "Does the bill change the law in any way or only codify the present patent laws?" Senator McCarran replied: "It codifies the present patent laws." 98 Cong. Rec. 9323 (1952). Although Senator McCarran later referred to the desire to clarify confusion that may have arisen from *Mercoid*, there was no indication that the legislation would work a major repeal of the patent misuse doctrine.

[14] The Justice Department's opposition to congressional enactment of § 271 does not indicate that the statute was intended to immunize respondent's conduct in this case. "[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably

I should add that even if the applicability of the patent misuse doctrine to nonstaple materials was not settled until *Mercoid,* overturning *Mercoid* where the infringer refused a license, would not resolve the case where, as here, the patentee refuses licenses to others and reserves to itself the entire market for the unpatentable, nonstaple article lying in the public domain. It may be true, as the Court emphasizes, *ante,* at 197, that the concepts of contributory infringement and patent misuse rest on antithetical foundations, but it does not follow that the price of their coexistence inevitably must be the wholesale suppression of competition in the markets for unpatentable nonstaples.

The Court offers reasons of policy for its obvious extension of patent monopoly, but whether to stimulate research and development in the chemical field it is necessary to give patentees monopoly control over articles not covered by their patents is a question for Congress to decide, and I would wait for that body to speak more clearly than it has.

Accordingly, I respectfully dissent.

Mr. Justice Stevens, dissenting.

This patentee has offered no licenses, either to competing sellers of propanil or to consumers, except the implied license that is granted with every purchase of propanil from it. Thus, every license granted under this patent has been conditioned on the purchase of an unpatented product from the patentee. This is a classic case of patent misuse. As Mr. Justice White demonstrates in his dissenting opinion, nothing in 35 U. S. C. § 271 (d) excludes this type of conduct from the well-established misuse doctrine.

The Court may have been led into reaching the contrary, and in my view erroneous, conclusion by the particular facts of this case. It appears that it would not be particularly

tend to overstate its reach." *NLRB* v. *Fruit Packers,* 377 U S. 58, 66 (1964).

profitable to exploit this patent by granting express licenses for fixed terms to users of propanil or by granting licenses to competing sellers. Under these circumstances, the patent may well have little or no commercial value unless the patentee is permitted to engage in patent misuse. But surely this is not a good reason for interpreting § 271 (d) to permit such misuse. For the logic of the Court's holding would seem to justify the extension of the patent monopoly to unpatented "nonstaples" even in cases in which the patent could be profitably exploited without misuse. Thus, for example, it appears that the Court's decision would allow a manufacturer to condition a long-term lease of a patented piece of equipment on the lessee's agreement to purchase tailormade—*i. e.*, nonstaple—supplies or components for use with the equipment exclusively from the patentee. Whether all of the five Members of the Court who have joined today's revision of § 271 (d) would apply their "nonstaple" exception in such a case remains to be seen. In all events, I respectfully dissent for the reasons stated in MR. JUSTICE WHITE's opinion, which I join.